*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 14-CF-0667, 14-CF-0712, 14-CF-0724 & 14-CF-1089

LESTER WILLIAMS, II, ROBERT GIVENS, MARCELLUS E. JACKSON, and KEIR MAURICE JOHNSON, APPELLANTS,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(2011-CF1-023394, 2010-CF1-014920,
2011-CF1-023408 & 2011-CF1-023407)

(Hon. Lynn Leibovitz, Trial Judge)

(Argued November 30, 2017                    Decided May 9, 2024)

*Peter H. Meyers* for appellant Lester Williams, II.

*Derek A. Webb*, with whom *Maureen B. Soles* and *Jeffrey T. Green* were on the brief, for appellant Robert Givens. *William R. Levi* also entered an appearance for appellant Givens.

*April E. Fearnley* for appellant Marcellus E. Jackson. After the appeal was briefed and argued, we granted Ms. Fearnley's motion to withdraw and appointed *Anne Keith Walton* to represent appellant Jackson.

*Sara E. Kropf* for appellant Keir Maurice Johnson.

*Elizabeth Gabriel*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth*

*Trosman*, *John P. Mannarino*, *Emily Miller*, and *Deborah Sines*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and EASTERLY, *Associate Judges*, and FISHER, *Senior Judge.*

Opinion for the Court PER CURIAM.

Opinion by *Senior Judge* FISHER, dissenting in part, at page 81.

PER CURIAM: Individuals alleged to be members of the criminal street gang known as "G-Rod" committed three shootings on separate days in June, August, and September 2010, killing two individuals and injuring two others. After a jury trial that spanned four months, appellants Lester Williams, Robert Givens, Marcellus Jackson, and Keir Johnson were found guilty of various crimes relating to these events.[1] The division unanimously concludes that Messrs. Jackson, Johnson, and Williams are entitled to a remand to allow the court to hold a *Motorola* hearing regarding their challenge to the admissibility of the cell-site evidence. We also unanimously conclude that appellants' convictions under D.C. Code § 22-951(b) in connection with their misdemeanor conspiracy convictions cannot stand and that certain duplicative convictions must merge. A majority of the division concludes that appellant Jackson's conviction for second-degree murder must be vacated due to a lack of sufficient evidence and that the attendant

---

[1] Coconspirators and fellow members of G-Rod, Lafonte Carlton and Devyn Black, pled guilty before trial.

street gang conviction must be vacated as well. The division discerns no other reversible or potentially reversible errors. In light of the length of this opinion, we have prepared a table of contents as an aid to the reader.[2]

## Table of Contents

I.  Factual Summary ..............................................................................................4

    A. The June 27, 2010, Shooting of Kevin Parker ...........................................5

    B. The August 11, 2010, Murder of Sean Robinson......................................6

    C. The September 28, 2010, Murder of Jamal Coates....................................8

II.  Pretrial Issues...............................................................................................11

    A. The Search Warrant................................................................................11

        1.  Factual Background ..................................................................12

        2.  No Plain Error .........................................................................13

    B. Cell-Site Data .......................................................................................16

    C. Jury Selection .......................................................................................20

        1.  Selective Investigation of Potential Jurors.................................20

        2.  Strikes for Cause .....................................................................27

        3.  Peremptory Challenges ............................................................31

III. Issues Arising During Trial .........................................................................34

    A. Admission of the Garvey Rap Video ......................................................34

---

[2] We follow the government's lead in doing so and express our gratitude for the organizational clarity of its 236-page brief.

B. Lay Interpretation of a Coded Conversation ..............................................37

C. The Trial Court Did Not Violate the Code of Judicial Conduct .............40

D. The Supplemental Instruction on Aiding and Abetting .........................42

IV. Other Issues.................................................................................................45

A. Sufficiency of the Evidence Against Jackson .........................................45

1. Jackson's Gang-Related Convictions.............................................46

2. Jackson's Second-Degree Murder Conviction............................48

B. Givens's Post-Arrest Statements..............................................................75

C. Conspiracy-Related Criminal Street Gang Convictions and Merger.......76

V. Conclusion ...................................................................................................80

FISHER, *Senior Judge*, dissenting in part................................................................81

## I.    Factual Summary

The government alleged that appellants were part of a criminal street gang in the area of 14th and Girard Streets, NW, called variously "G-Rod," "1-4," or "Cut Crew." Many witnesses testified that members of G-Rod sold drugs, bought guns, stored drugs and weapons, shared information about police informants, and committed robberies, shootings, and murders. G-Rod had a long-running "beef" with rival neighborhood crews known as "1-7," centered in the area of 17th and Euclid Streets, NW, and "640," located in the area of 640 Park Road, NW. The trial focused on the three shootings described below.

## A. The June 27, 2010, Shooting of Kevin Parker

The first shooting at issue occurred in a gas station parking lot at the intersection of Park Road and Georgia Avenue, NW. Kevin Parker, also known as "Kebo," was shot while speaking with Delontae Kelly; both of them were from the 640 neighborhood. Parker saw a car pull up to the gas station, heard gunshots, and tried to run for cover, but was shot in his left hand and right thigh. When speaking with detectives after the shooting, both Parker and Kelly said they could not identify the shooter. Parker knew appellant Keir Johnson from high school and testified at trial that Johnson was not the shooter.

Johnson, however, confessed to Ricardo Epps, a fellow member of G-Rod, that he shot "Kebo." Johnson also made a recorded phone call from jail to Lafonte Carlton in which he admitted the shooting. Johnson said that he "played basketball" with "Kebo" and that he was "dribbling two basketballs . . . but one was real flat." Epps explained that this meant Johnson was shooting two guns, but one did not have a lot of bullets. Physical evidence included casings fired from two different handguns, and video footage showed the shooter firing two handguns. Johnson was convicted of shooting Parker.

**B. The August 11, 2010, Murder of Sean Robinson**

Weeks later, on August 11, 2010, Sean Robinson, Tyon Britton, and Marquise Williams went to the parking lot behind H.D. Cooke Elementary School intending to smoke marijuana. Although the three were from the neighborhood of 17th and Euclid Streets, NW, Robinson was not considered part of the 1-7 crew. Two men approached Robinson, Britton, and Marquise Williams. When one of the men spoke "fighting words," Britton recognized the speaker as "Chop from Girard." "Chop" pulled out a gun and started shooting, and the three victims ran. When Britton and Marquise Williams stopped running, Britton told Williams that he recognized the shooter as "Chop." Robinson died of gunshot wounds to the chest and arm. In addition to eyewitness testimony, there were still photos and video footage from surveillance cameras showing the "figures" of the participants in the shooting. Appellant Givens was arrested for the murder on August 13, 2010.

At trial, Britton at first denied knowing the shooter's name or nickname, but he was impeached repeatedly with a videotaped statement he had adopted as part of his sworn testimony before the grand jury. In that testimony he identified the shooter as "Chop from Girard." The day after the shooting, Britton told Robinson's brother, Shaquelle Balton, that Chop shot at him and Robinson. Britton described Chop as having "fucked-up teeth." In a videotaped interview

with police two days after the shooting, Britton stated that he saw Chop's face and described his teeth as a distinctive feature. When speaking with detectives, Britton said that he had seen Robert Givens three or four times previously and on the night of the shooting, he "immediately" recognized him as "Chop from 14th and Girard." Britton also selected Givens's photo from a photo array. Givens's grandmother and Brandon Miller, a member of G-Rod and coconspirator turned cooperating witness, testified that Givens was known as "Chop" because of his buck teeth.

Epps, another member of G-Rod, knew Givens was "willing to kill" because in the past Epps had instructed Givens to shoot (or not to shoot) other individuals, and Givens had bragged to Epps about shootings he had committed. Additionally, the day after Robinson's murder, Givens called Epps and said that "he got one," that G-Rod member David Walton had helped him in the shooting, and that appellant Marcellus Jackson had driven them to the location of the shooting. Givens, aka "Chop," was convicted of second-degree murder of Robinson while armed and of assaulting Britton and Marquise Williams with a dangerous weapon. Marcellus Jackson, the driver, was acquitted. David Walton was not charged in the indictment.

### C. The September 28, 2010, Murder of Jamal Coates

On September 28, 2010, a number of people from different neighborhoods attended the funeral of Ashley McCrae. Ms. McCrae had relatives from the 17th and Euclid Street area, including Joseph McCrae, nicknamed "Fat Face," who was a member of 1-7. Cooperator Brandon Miller, who had a car, testified that Marcellus Jackson called him that morning and told him to come outside.

Miller testified that he picked up Jackson and Lester Williams, and later Keir Johnson. Ultimately, Miller drove Johnson and Williams to an alley by the church where the funeral was being held, dropping off Jackson along the way. Johnson and Williams got out of the car. Williams pulled his hood up and ran towards the sidewalk while Johnson ran into the street towards a Dodge. Miller could no longer see Jackson or 13th and U Streets, where he last saw Jackson. From the alley, Miller could not see what was happening, but he heard gunshots. Shortly thereafter, Johnson and Williams returned from the direction in which they had left and got back into the car. Miller saw that Williams was holding a "silver black pistol" that Miller thought was a 9mm handgun. Johnson also had a gun and said it had jammed and that "Phil"—meaning Phil Thompkins, the driver of the Dodge—"knew it was him because he looked him in the eye." Williams said "he knew his man was gone," wrapped the gun in his hoodie, and gave it to Johnson.

Mico Thompson, a passenger in Phil Thompkins's car along with Jamal Coates, testified that they were intending to follow the funeral procession to the cemetery. As Thompkins parked the car on the side of the street and waited for the funeral procession to begin, Thompson saw the gunman approach the driver's side of the car and aim at Thompkins. Thompson could only see the shooter's eyes because two shirts covered the rest of his face. The shooter pulled the trigger, but the gun did not go off. The gunman then "took off [the] safety" and started firing. Thompkins grabbed a 9mm pistol and fired back while driving away. A couple of blocks away, Thompkins crashed, causing the Dodge to flip over. Thompson crawled out a window and ran away while Thompkins and Coates stayed in the car. Thompkins was shot in the left shoulder and Coates died from a gunshot to the head.

In the getaway car, Miller sped down the alley away from the scene and dropped Williams off at 11th and Girard Streets. He then drove with Johnson to the house of Miller's parents at 1211 Girard Street, NW. Miller and Johnson looked for a place to hide the guns in the alley, but instead stored the guns in the house. Miller and Johnson then walked separately to 1401 Fairmont, NW. Miller lived there with the mother of his child, and Johnson lived in another apartment. Miller put on a different shirt, then went back outside and saw Jackson walking toward 1401 Fairmont. They both went inside the building, and Miller saw

Jackson walk toward Johnson's apartment. After retrieving a bike from Jackson, Miller also saw Williams walk into 1401 Fairmont; Miller did not linger long enough to see Williams go inside Johnson's apartment, but he saw him standing in front of the apartment door.

After Johnson and Miller had parted ways, Miller received phone calls from Williams, who said that the police were on 11th Street and that they were speaking to Miller's mother. Miller then returned to his parents' house, where he was arrested. Police found two pistols in Miller's bedroom: a loaded 9mm pistol and a .40 caliber pistol that had malfunctioned. The police recovered seven 9mm cartridge casings and one .40 caliber cartridge casing from the scene of the shooting.[3]

Two days after the shooting, Williams confessed to his ex-girlfriend, Jasmine Wiseman, that he "let go like 15 shots" and that he was "nervous when the boys started shooting back." Williams told Wiseman that he was with another

---

[3] A government expert testified these cartridge casings "matched" the pistols found in Miller's bedroom. But as in *Williams v. United States*, 210 A.3d 734 (D.C. 2019), the government did not establish "a foundation for opinion testimony that unqualifiedly connects a specific bullet to a specific gun," *id*. at 743 (holding that the admission of such testimony is plain error in light of *Gardner v. United States*, 140 A.3d 1172 (D.C. 2016)). In order to avoid any complications from consideration of this testimony, which has not been separately challenged by the defendants, we opt to disregard it.

person and Miller had dropped them off. Williams subsequently warned Wiseman that she should not be talking to police. Johnson, Williams, and Jackson were convicted of murder and other offenses for these shootings.

## II.  Pretrial Issues

### A.  The Search Warrant

Relying on *United States v. Griffith*, 867 F.3d 1265 (D.C. Cir. 2017), Jackson argues that certain evidence found in a laptop and cell phones was the tainted fruit of a search warrant that was overbroad. He asserts that: (1) the warrant—issued in a different investigation involving a different suspect named Irving Johnson—was defective because the references to "cellular telephones" and "computers" did not identify with particularity the items to be seized; and (2) the warrant permitted seizure of all cell phones and laptops found in the residence without linking the items to the different crimes Irving Johnson was suspected of committing. The government argues that Jackson waived this issue by failing to file a pretrial motion to suppress this evidence. At the very least, the government says, we should apply plain error review to this issue, which Jackson raises for the first time on appeal in supplemental briefing. Assuming without deciding Jackson did not waive his Fourth Amendment claim, we apply a plain error standard of review, *see, e.g., Chew v. United States*, No. 22-CF-0163, slip op. at 3-4, 2024 WL

1918730 at *1 (D.C. May 2, 2024), and Jackson has not established that reversal is required for plain error.

## 1. Factual Background

On July 27, 2011, ten months after the September 2010 murder of Coates, the Metropolitan Police Department executed a warrant at 1401 Fairmont Street, Apartment 112, to search for evidence in an unrelated case in which Irving Johnson was a suspect. Irving Johnson resided in this apartment with his brother, appellant Keir Johnson. At the time the warrant was executed, it appeared that Jackson was staying there as well. Among other things, the police seized one Toshiba laptop, two Sprint HTC cell phones, and one Sprint LG cell phone. At least some of these devices may have belonged to Jackson. Jackson unsuccessfully moved to suppress statements he made when the police seized the devices, but he did not move to suppress the devices themselves or evidence contained in them.

Evidence from the laptop and two of the cell phones was admitted at trial. This included internet searches on the laptop for "Brandon Miller," "Jamal Coates," and "Robert Givens," and a file containing Givens's indictment. The contact list on one of the phones contained the name "Yusef" and an incoming text message received on the other phone read "Marcellus."

## 2. No Plain Error

The government and Jackson have different interpretations of whether and how this court's precedent regarding the waiver of a motion to suppress evidence applies to Jackson's Fourth Amendment challenge.[4] *But see Chew*, No. 22-CF-0163, slip op. at 19, 2024 WL 1918730 at *7 (Easterly, J., concurring) (distinguishing waiver from forfeiture and discussing the general availability of plain error review for unpreserved claims of legal error). Yet even assuming no waiver, we still review Jackson's claim for plain error,[5] and because Jackson cannot establish plain error on this record, reversal is not warranted.

---

[4] Citing D.C. Code § 23-104(a)(2) (stating that a motion to suppress evidence must be made pretrial "unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion"), the government contends that Jackson's failure to file a suppression motion constitutes a complete waiver of his Fourth Amendment argument and that this court should not consider it at all. Jackson counters that he neither waived nor forfeited his challenge to the warrant because the D.C. Circuit's opinion in *Griffith* established a "new legal principle" that was unavailable to Jackson at the time of trial. *But see Chew*, No. 22-CF-0163, slip op. at 33 n.5, 2024 WL 1918730 at *11 n.5 (Easterly, J., concurring).

[5] In his supplemental reply brief, Jackson asserts that notwithstanding his failure to seek suppression of this evidence in the trial court, we should analyze the merits in light of the D.C. Circuit opinion issued while this case was pending on appeal, essentially treating the Fourth Amendment claim as preserved. Jackson does not develop his contention that plain error review does not apply. Assuming that Jackson did not waive this challenge and could receive the benefit of new case law in this direct appeal, *see Griffith v. Kentucky*, 479 U.S. 314 (1987), he still must establish that the error he alleges was plain at the time of appellate review.

Under a plain error standard, Jackson must show error that is plain, that affected his substantial rights, and that seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Guevara v. United States*, 77 A.3d 412, 418 (D.C. 2013). Our analysis focuses on the effect the admission of the laptop and the cell phones had upon Jackson's substantial rights. "To meet this third prong of plain error review, it is appellant['s] burden to show a 'reasonable probability' of a different outcome" but for the established error. *Perry v. United States*, 36 A.3d 799, 818 (D.C. 2011) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 81-82 (2004)).

Because we are reversing Jackson's second-degree murder conviction, the associated street gang conviction, and the street gang conviction attendant the misdemeanor conspiracy conviction, *see infra*, we consider harm only as to the remaining convictions we are upholding—namely, conspiracy, assault with a dangerous weapon, and the street gang conviction associated with that assault. In his supplemental briefs, Jackson argues that the laptop and cell phones were critical evidence in the government's case against him on these charges. Specifically, the government used the laptop to help connect Jackson to the conspiracy—highlighting, among other things, the internet searches about G-Rod

---

*See Henderson v. United States*, 568 U.S. 266, 279 (2013); *Williams v. United States*, 210 A.3d 734, 743–44 (D.C. 2019).

members and their crimes that were conducted on the computer. It used the evidence that Jackson possessed a cell phone registered to somebody else to support its theory that Jackson used burner phones, which diminished the exculpatory value of phone records that showed no call from Jackson's known number to Miller's phone at the time the government contended that call was made. And the government used one of the cell phones to establish that Jackson had a contact named Yusef, thus corroborating Brandon Miller's testimony that Jackson told him their rivals were "in the car like Yusef."

After careful review of the voluminous record in this case, we conclude that Jackson has failed to show a reasonable probability that the guilty verdicts against him were attributable to any error on the part of the trial court in admitting the laptop and cell phones into evidence and allowing argument regarding their import. As an initial matter, the government's attempt to impute everything on the laptop to Jackson was in some tension with the evidence that police seized the computer from the hands of somebody else and that other people obviously used it. And even assuming Jackson was searching the internet for information about people he unquestionably knew from the neighborhood, that evidence was not sufficiently probative to meaningfully alter the dispute about Jackson's level of involvement in G-Rod.

The same is true of the evidence that Jackson had a phone contact named Yusef and that he may have used burner phones. Miller's testimony that Jackson called him and told him that the "car like Yusef" was about to pass Miller's car was an undeniably important aspect of the government's theory regarding Jackson's involvement in Jamal Coates's murder and Phil Thompkins's assault. And to be sure, Miller's testimony was vulnerable on myriad grounds. We are nevertheless persuaded that there is no reasonable probability that the jury's apparent crediting of Miller's testimony that Jackson made the call hinged on evidence that Jackson used other phones and in fact knew someone named Yusef. *See Perry*, 36 A.3d at 818. Though relevant, this evidence is too attenuated to have been determinative.

## B. Cell-Site Data

Before trial, the government filed notice that it planned to call FBI Special Agent Kenneth LaVictoire as an "expert in the field of cellular phone technology, cellular towers, and the analysis of historical cellular phone records."[6] Two

---

[6] "Historical cell-site analysis uses cell phone records and cell tower locations to determine, within some range of error, a cell phone's location at a particular time. A cell phone is essentially a two-way radio that uses a cellular network to communicate." *United States v. Hill*, 818 F.3d 289, 295 (7th Cir. 2016) (citing Aaron Blank, *The Limitations and Admissibility of Using Historical*

defendants, Johnson and Jackson, filed motions *in limine* to exclude Agent LaVictoire's testimony. Although Johnson's counsel "withdrew" her client's motion at a pretrial hearing and stated that another expert would testify on the topic for some of the defendants, Johnson continued to join the motion filed by Jackson, who subsequently argued at the hearing that LaVictoire's testimony should not be admitted. The trial court denied the motion on the ground that the proffered expert testimony of Agent LaVictoire satisfied the *Dyas/Frye* test which then governed admissibility. *See Dyas v. United States*, 376 A.2d 827 (D.C. 1977); *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

After the trial—but before oral argument of these appeals—this court issued its decision in *Motorola Inc. v. Murray*, 147 A.3d 751 (D.C. 2016) (en banc), ending this jurisdiction's use of the *Dyas*/*Frye* test and adopting the test for the admission of expert testimony initially set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and subsequently in Federal Rule of Evidence 702.[7] *Motorola*, 147 A.3d at 756-57.

---

*Cellular Site Data to Track the Location of a Cellular Phone*, 18 Rich. J.L. & Tech. 3, 5 (2011)).

[7] Federal Rule of Evidence 702 then provided: A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

Now before this court, appellants urge us to remand for an evidentiary hearing under the new *Motorola* standard. As this court has explained, *Motorola* applies to all cases "pending on direct review or not yet final." *(Marlon) Williams v. United States*, 210 A.3d 734, 743 (D.C. 2019) (quoting *Davis v. Moore*, 772 A.2d 204, 226 (D.C. 2001) (en banc)). The government does not dispute the retroactivity of *Motorola* but argues that a remand is unnecessary. We agree that appellants Williams, Jackson, and Johnson are entitled to a remand in order for the trial judge to apply *Motorola*.[8]

---

    (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b)    the testimony is based on sufficient facts or data;

    (c)    the testimony is the product of reliable principles and methods; and

    (d)    the expert has reliably applied the principles and methods to the facts of the case.

147 A.3d at 756 (quoting Fed. R. Evid. 702). This version of Rule 702 had been amended to reflect the Supreme Court's guidance in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158 (1999). *See id.*

[8] Appellant Givens did not brief this issue, but adopted the arguments of his codefendants "to the extent they apply to his charges." The record reveals that cell-site data was not available for the phone used by appellant Givens on August 11, 2010. Thus, Agent LaVictoire did not express an opinion concerning the

A ruling on the admissibility of expert testimony is subject to review for abuse of discretion. *See Girardot v. United States*, 92 A.3d 1107, 1113 (D.C. 2014); *accord Motorola*, 147 A.3d at 755 ("Rule 702 grants the district judge the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case." (quoting *Kumho Tire*, 526 U.S. at 158)). However, the trial judge's decision to admit Agent LaVictoire's testimony was based on her analysis under *Dyas*/*Frye*, the test that governed at the time. She did not have a chance to rule on the admissibility of the testimony under the standard we later adopted in *Motorola*. Therefore, we hold that a remand is necessary in order for the trial judge to apply that test. *See* D.C. Code § 17-306 (authorizing this court to "remand . . . [and] require such further proceedings to be had, as is just in the circumstances").

When applying Rule 702 on remand, the trial judge may take into account the trial testimony of Agent LaVictoire and defense expert William Folsome in addition to the arguments made and documents submitted during the hearing on the pretrial motion. The parties should also have the opportunity to present supplemental authority and to proffer additional testimony. Any party aggrieved

---

location of that phone during the events surrounding the murder of Sean Robinson. Givens was arrested in August and was not charged with the shootings that occurred on September 28, 2010.

by the trial court's ruling may seek review in this court by filing a new notice of appeal.

## C. Jury Selection

Givens argues that the government's selective investigation of potential African American jurors and the court's decision to strike certain jurors for cause based on the information discovered violated his right to due process. Givens also asserts that the trial court should have granted his challenge to the government's exercise of peremptory strikes under *Batson v. Kentucky*, 476 U.S. 79 (1986). Jackson, Johnson, and Williams adopt these arguments.

### 1. Selective Investigation of Potential Jurors

After the trial court read a series of questions and potential jurors wrote responses on index cards, members of the venire came to the bench for follow up inquiries. Voir dire included the familiar two-part "Ridley" question—Question 8A: "[H]as any member of that group, meaning you, close friends or immediate family, within the past ten years been either arrested for, charged with or convicted of any crime[?]" and Question 8B: "Has any member of that group, meaning you, close friends or immediate family, ever been either a victim of, a witness to or charged with a crime similar to the crimes charged in this case[?]" *See United*

*States v. Ridley*, 412 F.2d 1126, 1128 (D.C. Cir. 1969). Motions to strike for cause occurred as each prospective juror was leaving the bench after questioning. Just as the parties were completing their initial for-cause challenges in the morning on the third day of jury selection, and before they began to exercise their peremptory challenges, the government informed the court that it had conducted targeted computerized background checks of seven jurors who had been questioned the previous two days. The government further informed the court that these background checks revealed that these jurors had criminal histories they failed to disclose. This screening used some databases to which the defense did not have access.[9] All seven of these prospective jurors were African American.

Appellants' counsel expressed concern about "the systematic targeting of African American jurors" for investigation and argued that the government was doing this to "expand" its number of peremptory challenges and to "back-door[] *Batson*." Counsel argued that, "[i]f there was a concern that there were [undisclosed] criminal convictions or arrests on anybody's part, it would have made sense to run it for everybody." Appellants requested that the government

---

[9] It was undisputed that defense counsel had access to only two of the six databases used by the government to investigate the jurors.

perform background checks on all the potential jurors and turn that information over to them.[10]

The trial court granted this request and ordered the government to screen all the jurors who remained qualified after the first two days of jury selection (the days from which the government had selected its subset of jurors to screen) and to provide summaries of all the results to the defense. In addition, the court asked if the defense wanted the court to direct the government to explain why the government had investigated these particular jurors, as it would after a *Batson* challenge. The defense endorsed this proposal. The government argued, however, that "*Batson* [did not] appl[y]" and the court had no oversight role to play regarding the government's newly raised for-cause challenges. The court rejected the government's argument. It explained that it had "an independent obligation to make sure that there is absolutely nothing about the government's decision making in terms of peremptories that is racially biased" and that it "need[ed] to make sure that the process by which this jury is selected is not infected with that." In short, the court determined that the government's conduct was not "out of the ballpark of *Batson*."

---

[10] Givens's counsel also asked the court to grant the defense extra peremptory strikes.

The government then argued that running criminal checks on all prospective jurors cured any problem: "So now everyone has been run effectively, the person who was discriminatorily run—if hypothetically someone . . . was being discriminatorily run, we've now undiscriminatorily run and we're seating jurors." Ultimately, the court agreed with this argument. The court ruled "as if" the defense had made out a prima facie case under *Batson* that the government was investigating jurors to strike them based on race.[11] It then determined that the remedy for such selective investigation was to "undo the selectivity." Because it took this remedial step, the court determined "there [wa]s no reason at this time to inquire of the government as to the reasons for selecting out the specific eighteen people."[12] But the court made clear that "the potential selectivity" and the

---

[11] The court explained that it had not actually found a "clear prima facie case . . . of a *Batson* violation."

[12] By this time, the court had already asked the government to "describe the undertaking with respect to looking at particular jurors' records and information, how [it] selected whom to inquire about, and . . . how many [potential jurors it] inquired about."

The government informed the court that the subset of jurors it had selectively screened had been bigger than the seven jurors it had initially brought to the court's attention—eighteen in all, thirteen of whom were African American, five of whom were white. Thus, out of the fifty-eight qualified jurors from the two days, twenty-five of whom were African American and thirty-one of whom were white, the government screened 52% of all qualified African American jurors and only 16% of all qualified white jurors. The parties looked at different percentages—the fact that African Americans made up only 43% of the venire but 72% of the subset of selectively screened jurors; but those numbers did not identify

discussion the parties had had could become a basis for a future *Batson* challenge based on the government's use of peremptory strikes.

On this record and in light of the appellants' arguments, it is not clear to us that the court was obligated to do more. First, appellants argue that the government, via its selective investigation, was attempting to gain "a significant and inequitable advantage." But even as they argue that "[p]eople of color are far more likely to be arrested in this country than Whites, [and that, a]s a result, the use of background checks—particularly the selective use of background checks to investigate African Americans—to justify a for cause strike, raises a serious question as to whether the strike is motivated by a race-based reason," appellants do not argue that the government should be precluded from investigating the criminal histories of potential jurors generally. To the contrary, they take the position that "the prosecution is free to conduct any investigation it deems necessary," so long as the defense has equal access to the same databases consulted by the government. Various state courts have held that defendants should have

___

how much more likely an individual African American juror was to be selectively screened: 3.25 times, or 325%, more likely than a white person.

The government explained that it determined who to screen by "look[ing] at the list" and asking "who are the people we would strike, and then [we] ran those people[,] . . . people that gave us a lot of concern when they were up there but the court did not strike[;] . . . so for each one there might be a different reason." The court did not direct the government to put those reasons on the record.

equal access to criminal history information used by the government during jury selection.[13] We need not decide whether there is a right to such access in this jurisdiction because the trial court ordered the government to make that information, in the form of summaries, available to appellants in this case. In other words, any due process challenge to the prosecutors' investigation of the jurors using databases to which the defendants did not have access was rendered moot by the court's unchallenged curative measures.[14]

---

[13] *See, e.g.*, *State v. Second Judicial Dist. Court in & for Cty. of Washoe,* 431 P.3d 47, 51 (Nev. 2018) (en banc) ("Upon motion by the defense, the district court must order the State to disclose any veniremember criminal history information it acquires from a government database that is unavailable to the defense."); *State v. Goodale*, 740 A.2d 1026, 1030-31 (N.H. 1999) (ruling based on state constitution that trial court erred in allowing the state to use criminal records of prospective jurors not made available to the defense but affirming the conviction for failure to demonstrate prejudice; "[F]undamental fairness requires that official information concerning prospective jurors utilized by the State in jury selection be reasonably available to the defendant."); *State v. Bessenecker*, 404 N.W.2d 134, 138 (Iowa 1987) ("[C]onsiderations of fairness and judicial control over the jury selection process require" defendants to have equal access to jurors' criminal history data obtained by the government.); *Losavio v. Mayber*, 496 P.2d 1032, 1034-35 (Colo. 1972) (en banc) (holding that defense attorneys are entitled to conviction records of prospective jurors that district attorney routinely receives from police department).

[14] Although appellants now argue that the summaries were inadequate and did not provide them with the type of information which might have been more useful to them, they did not make this argument to the trial court. In fact, when the trial court specifically asked defense counsel "does a summary sound fine," counsel for Williams responded "[y]es, a summary is fine . . . as long as the Government has the back-up copy to verify the information on the summary . . . ." and none of the other defense counsel, who had been litigating this issue together,

Appellants also argue that the government's selective investigation of African American jurors was part of an effort to evade a *Batson* inquiry into race-based strikes. Be that as it may, as noted above, the trial court actually conducted a *Batson*-type inquiry and assumed that the appellants had made a prima facie case, imposed curative measures, and invited the appellants to renew their *Batson* argument if needed during the government's exercise of its peremptory challenges. While we assume that it would have been well within the court's authority to conduct a more pointed inquiry into the government's reasons for investigating the selectively targeted venire persons,[15] we cannot say on this record that the court reversibly erred by requiring the government to do what it "should have done at the beginning, which is look at everybody or randomly choose people

---

expressed a contrary view. Accordingly, we consider this argument waived. *See Mason v. United States*, 53 A.3d 1084, 1102 (D.C. 2012) ("We have repeatedly held that a defendant may not take one position at trial and a contradictory position on appeal.")

[15] *See Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) ("[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose"); *Batson*, 476 U.S. at 86 ("Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure."). This is not to say, however, that the procedural framework for litigating a *Batson* challenge to the exercise of peremptory strikes would apply to challenges for cause. *See United States v. Elliott*, 89 F.3d 1360, 1364-65 (8th Cir. 1996) ("*Batson* applies only to peremptory strikes. We know of no case that has extrapolated the *Batson* framework to for-cause strikes.").

or in a principled way decide that these are people we want to look at for reasons having nothing to do with race that we can articulate."

## 2. Strikes for Cause

Appellants next challenge the trial court's removal of jurors 251 and 800 for cause. Assuming that these claims were preserved as to all appellants,[16] and that these claims are cognizable, appellants have not shown reversible error.[17]

"The trial judge has broad discretion over whether to strike a juror for cause." *(Anthony) Harris v. United States*, 606 A.2d 763, 764 (D.C. 1992). However, appellants appear to argue that the trial court may not grant for-cause challenges based on a juror's misrepresentation or failure to disclose material information during voir dire, as opposed to a finding of bias or partiality. We

---

[16] Only Williams's counsel objected to the removal of juror 251 for cause—both Givens's and Johnson's counsel affirmatively stated to the trial court that they had no objection to juror 251's removal and Jackson's counsel took no position. Johnson's and Williams's counsel objected when the trial judge asked the parties their position regarding dismissal of juror 800. Givens's counsel stated that he had no basis to object to the removal of juror 800 and Jackson's counsel took no position.

[17] This is not a case where jurors were excluded because of the views they expressed, a practice which "may unacceptably skew the jury in favor of one side." *See Mason v. United States*, 170 A.3d 182, 190 (D.C. 2017) (reversing conviction because excluding juror who believed criminal justice system was unfair to black men "had a tendency to unacceptably skew the jury in favor of one side").

disagree with the proposition that only a determination that a juror is biased will justify removal from jury service for cause.

Appellants rely in large part on cases in which a juror's misrepresentation or omission is discovered after trial. In such circumstances, a hearing is required where the defendant seeking a new trial has the burden to prove actual bias.[18] In this case, however, the trial had not begun. Indeed, the parties were still in the process of selecting the jury. At this stage of the proceedings, the court has more flexibility.

Although challenges for cause are used primarily to eliminate those thought to harbor bias or partiality, the trial court has authority to remove a prospective juror for unfitness or failure to meet statutory qualifications. The parties have "a legitimate and reasonable concern to select jurors who [will] be able to fulfill their responsibilities," and the trial judge "has broad discretion in deciding whether to excuse a juror for cause to achieve that goal." *Steele v. D.C. Tiger Market*, 854

---

[18] *See, e.g.*, *Poth v. United States*, 150 A.3d 784, 789 (D.C. 2016) ("When a defendant shows that a juror responded falsely or omitted material information in his or her voir dire responses, the defendant is entitled to a hearing in which the defendant has the opportunity to prove actual bias on the part of the juror") (internal quotation marks omitted); *Young v. United States*, 694 A.2d 891, 894 (D.C. 1997) (noting that "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias") (quoting *Smith v. Phillips*, 455 U.S. 209, 215 (1982)).

A.2d 175, 179 (D.C. 2004) (internal quotation marks omitted). *See, e.g.*, D.C. Code § 11-1908(b)(3) (a juror may be "excluded pursuant to the procedure specified by law upon a challenge by any party for good cause shown"); *Eizember v. Trammell*, 803 F.3d 1129, 1135 (10th Cir. 2015) ("the trial judge is best positioned to determine whether a potential juror will be able to follow his or her instructions"); *United States v. Dominguez*, 615 F.2d 1093, 1095 (5th Cir. 1980) ("it is within the trial judge's sound discretion to remove a juror whenever the judge becomes convinced that the juror's abilities to perform his duties become impaired").

After a trial has begun, the court must comply with Superior Court Rules of Criminal Procedure 23 and 24, which deal with a jury of less than twelve and substitution of alternates. Even then, we have recognized that the court may excuse jurors for reasons other than bias or partiality. *See Kelly v. United States*, 134 A.3d 819, 824-26 (D.C. 2016) (record sufficient to demonstrate juror incapable of performing his duties when juror was over an hour late for trial in progress; trial judge's findings that the tardiness was "seriously interfering" with the trial were supported); *(Kalete) Johnson v. United States*, 116 A.3d 1246, 1250-52 (D.C. 2015) (trial court did not abuse its discretion in dismissing juror mid-trial because of inability to secure childcare; "Courts have long recognized that jurors with young children should be excused for cause when they are unable

to obtain child-care for their children.") (alteration and internal quotation marks omitted); *but see Hinton v. United States*, 979 A.2d 663, 669-70, 683-85 (D.C. 2009) (en banc) (record did not support trial judge's mid-trial findings that the juror lacked capacity to perform his duties when neither the juror (nor any fellow juror) was interviewed in order to evaluate his fitness).

In this case the court had legitimate reasons to excuse these two jurors and its conclusions were supported by the record. Juror 251 was dismissed because of her "complete lack of attention to my directions [and] her obligations." She was forty-five minutes late to court, she failed to disclose "that she had a court date that would conflict with this case" (a pending charge of possession of marijuana scheduled for trial the following month in Maryland),[19] and she admitted she was "in and out of the questions" during voir dire. The trial judge raised concerns about juror 800 because he failed to disclose his lengthy criminal record. The

_____

[19] A pending misdemeanor or felony charge disqualifies a prospective juror. *See* D.C. Code § 11-1906(b)(2)(B) ("An individual shall not be qualified to serve as a juror . . . if that individual . . . has a pending felony or misdemeanor charge."). Appellant asserts that the Clerk of the Superior Court has exclusive authority to determine if a juror is qualified for jury service. We do not agree. Although the Clerk "shall have authority to inquire into the criminal history records of any prospective . . . juror for the purpose of corroborating and determining the juror's qualifications for jury service" (*see* Jury Plan for the Superior Court of the District of Columbia § 7 (effective Nov. 9, 2013) (in effect at the time of trial)), appellant cites no support for the proposition that a judge lacks authority to disqualify a juror because of a pending felony or misdemeanor charge that comes to light during voir dire.

court found this failure deliberate and his explanations for that failure not credible.[20] But the court ultimately concluded that "even if . . . [it] did credit" juror 800's explanation, "what he's saying is he's so distracted by his unemployment and all of his other circumstances" that, in the court's judgment, "he would be unable to perform the duty of a juror in this case." Because the record supports the trial court's determination that these individuals would be unable to fulfill their responsibilities as jurors, we cannot say that the trial court abused its discretion in dismissing them for cause.

### 3. Peremptory Challenges

Givens also challenges the government's use of peremptory strikes to remove jurors 647, 122A, and 803 (seat numbers 14, 46, and 44, respectively) (all African Americans). He argues that appellants established a prima facie case and the government's race-neutral explanations for striking these jurors were a pretext for racial discrimination. *See Batson*, 476 U.S. at 87-88. The question whether

---

[20] Givens also argues that the trial court improperly took judicial notice of the government's summary of the juror's arrest record and relied on incorrect information to dismiss the juror. When the trial court asked defense counsel if anyone objected to striking this juror for cause, counsel for Givens and Williams stated they had no objection, and counsel for Johnson and Jackson argued only that the juror's inaccurate representation of his criminal record might be due to a faulty memory, thereby effectively conceding that his arrest record was accurate and reliable. Accordingly, we conclude that all defendants waived this argument.

appellants made a prima facie showing is moot because the trial court proceeded to stage three of the *Batson* process and made findings of fact regarding discriminatory intent for each contested challenge.[21]

Without deciding if appellants had established a prima facie case, the trial judge asked the government to explain its strikes. The government stated that it struck juror 647 for various reasons—she gave no answers in response to standard questions, was unemployed, and had a "weird exchange with the court" in which she stated that she had to take care of her husband because he was disabled, but not for medical issues. In addition, during its investigation the government learned that the juror's stepson who lived with her had numerous arrests, one of which was near 14th and Girard Streets. The government proffered that it struck juror 122A because he gave no answers to the questions and because it was hard to believe that he had lived in D.C. for 50 years and had managed several buildings but (so far as he revealed) had never known any crime victims or defendants or been a witness to a crime. Also, while at the bench juror 122A stuttered and seemed to be nervous, leading the government to be "concern[ed] about his ability to deliberate and

---

[21] *See Robinson v. United States*, 890 A.2d 674, 682 (D.C. 2006) ("[O]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges *and the trial court has ruled on the ultimate question of intentional discrimination*, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." (alterations and internal quotation marks omitted) (emphasis in original).

follow a complicated case." As to juror 803, the government explained that she also had not answered any standard questions, wrote the wrong juror number on her card, showing she was inattentive during voir dire, and was unemployed. Also, she had lived in D.C. for a long time (60 years), but failed to respond to questions asking whether she had known any crime victims or defendants or had ever been a witness to a crime.

"The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). The trial court credited the government's explanations for striking these jurors and concluded they were "non-race-based" reasons: Juror 647 (strike no. 6) ("reasons . . . are credible"; "all of that is entirely reasonable, and I conclude an appropriate non-race-based reason for the strike"); Juror 122A (strike no. 11) ("a reasonable non-race-based proffer [] for striking the juror"); Juror 803 (strike no. 12) ("a non-race-based, entirely appropriate, reasonable, non-pretextual basis on which to strike her"). "A trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *(Bobby) Johnson v. United States*, 107 A.3d 1107, 1112 (D.C. 2015); *see also Rice v. Collins*, 546 U.S. 333, 338 (2006) ("the credibility findings a trial court makes in a *Batson* inquiry are reviewed for clear error"). Appellants have failed to show that the court clearly

erred in crediting the government's race-neutral explanations, and their *Batson* challenge therefore fails.[22]

## III.    Issues Arising During Trial

## A. Admission of the Garvey Rap Video

At trial, the government played a rap music video that was filmed sometime around July 2010 and produced by Marcus Wells. Wells's name as a performer was "Garvey, 'The Chosen One.'" Garvey sold copies of the video and posted it on YouTube. In the video, Garvey is seen rapping in multiple locations, including the back alleyway of 14th and Girard Streets, NW. Jackson and Johnson are standing close to Garvey and can be seen dancing and making hand gestures, including mimicking holding a gun. One person in the foreground (not one of the defendants) is holding a machete. A much larger group of people whom Epps

---

[22] We recognize that the government's conduct prior to the peremptory strike phase may, and should, be taken into consideration when the trial court analyzes a *Batson* claim. *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243-46 (2019). As the Supreme Court explained in *Flowers*, the trial court may consider the whole "history of the case," including "evidence of a prosecutor's disparate questioning and investigation of African American and white prospective jurors in the case; . . . relevant history of the State's peremptory strikes in past cases; or other relevant circumstances that bear upon the issue of racial discrimination." *Id.* *Flowers* postdates the trial in this case. That said, the trial court effectively anticipated *Flowers* and invited the defense to discuss the earlier selective investigation when it made any *Batson* argument. When the time came, however, the defense did not make an argument that this earlier event buttressed its *Batson* claim.

identified as being from the neighborhood surrounds them, and at times the video shows the street filled with people smiling, dancing to the music, and posing for the camera. The video was obviously shot in different takes and edited (Garvey and the individuals immediately around him are seen in different frames wearing color-coordinated white or black outfits), and the soundtrack is overlaid on the video footage.

In one verse of his lyrics (highlighted by the government in its brief), Garvey sings "I live by two words, honor and respect. Break that, the penalty is death." Garvey also raps about Tayon Glover, a well-respected member of G-Rod whose murder in 2007 was believed to have been committed by members of 1-7. A photograph of Glover appears on the screen while Garvey sings "I do this here for Tay, cuz every day I miss him. But before my brother left, he took some busters with him." In the chorus, Garvey sings: "I was born and raised, on 1-4 and Girard. Mess around, and you gonna meet your God."

The trial court admitted the video on two evidentiary bases. As to all the appellants, the court held that it was admissible as a statement of a coconspirator in furtherance of the conspiracy. Additionally, as to Jackson and Johnson, who are standing in immediate proximity to Garvey in the video, the court ruled that the "statements made, the words said, and any actions done, gang signs, et cetera"

were adoptive admissions. Appellants challenge the court's ruling, arguing that: (1) Garvey was not a coconspirator at the time the music video was made; and (2) even if Garvey was a coconspirator, the video did not constitute a statement in furtherance of the conspiracy. Jackson and Johnson also challenge treating the video as their adoptive admission simply because they were dancing next to Garvey.

We assume without deciding that the video was not admissible on either ground. But, given the minimal time and attention the government devoted to the video and in light of all of the other evidence in the case, we conclude that its admission was harmless. *See Kotteakos v. United States*, 328 U.S. 750, 765 (1946) (requiring reversal for nonconstitutional error "if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error"). The three minute and thirty second video was played only once during a very lengthy trial (almost forty days) spanning four months.[23] The video was not a focus of witness testimony.[24] Lastly, the government's references to the video in

---

[23] During jury deliberations, the trial court estimated the case had taken thirty-seven or thirty-eight days to try.

[24] The only witness who testified about the video was Epps, and other than a few pages of testimony when the video was introduced through him (much of which was devoted to identifying various individuals in the video), the government

closing were brief and the government never indicated that the video directly inculpated the appellants in the crimes charged. Accordingly, we can say with fair assurance that a reasonable juror would not have been substantially swayed by the admission of the Garvey rap video into evidence at appellants' trial.

## B. Lay Interpretation of a Coded Conversation

Brandon Miller, a member of G-Rod who drove the car on September 28, 2010, pleaded guilty and cooperated with the government. During his testimony Miller was asked to interpret a recorded "jail call" in which he spoke with appellant Jackson, who seemed to be speaking in code. Jackson's counsel objected when Miller was asked to interpret, complaining that he was not competent to testify "as to what Mr. Jackson's thoughts were . . . what it was Mr. Jackson meant by" those words.

Miller explained that he grew up in the Girard Street area where the "guys" used "[a] lot of slang" to speak to each other and that he understood "that kind of slang." Applying our decision in *King v. United States*, 74 A.3d 678 (D.C. 2013),

___

did not elicit any further testimony related to the video, save for a stray reference to the "cut" or alley seen "on the Garvey video earlier," and an acknowledgement from Epps that, when Garvey sang about killing "snitches" in the video, Epps understood he was referring generally to people like Epps who cooperate with the government.

the trial court determined that the government had "laid a foundation" for Miller's knowledge of the code or slang being spoken. "[C]learly the witness has gained his knowledge from the rational perceptions that normal humans use to gain knowledge of language and language that is common to a given group or community." *See King*, 74 A.3d at 683 ("[T]he reasoning process the [witnesses] employed to interpret the street language was the everyday process of language acquisition."). Moreover, "those interpretations very much help the trier of fact, particularly, in these phone calls which are very cryptic, deliberately so." *See id*. at 681 (applying Fed. R. Evid. 701 requirement that lay witness opinion be "helpful to clearly understanding the witness's testimony or to determining a fact in issue"). The court instructed the jury that the witness's opinion or interpretation "must be rationally based on the witness' perception. . . . [Y]ou are to give a lay opinion only such weight as you believe it deserves."

"A lay witness with personal knowledge about particular slang properly may testify to its meaning." *(Emanuel) Jenkins v. United States*, 80 A.3d 978, 1000 (D.C. 2013). We review the trial court's decision to allow such testimony for abuse of discretion, *id*.; *King*, 74 A.3d at 681, and find none here.

Jackson seems to have abandoned the objection he lodged at trial, acknowledging that it was permissible for Miller to explain, for example, that

"wicked" meant that the calls were being recorded. He now asserts that Miller "crosse[d] the bounds from strict street lingo interpretation to an interpretation of a person's guilt (and the ultimate issue in the case)."

This new argument is based on answers elicited from Miller on cross-examination and redirect. Referring to Miller's previous testimony that he was hoping to get Jackson to incriminate himself in the telephone conversation, Jackson's counsel prodded, "He didn't admit to anything, did he?" Miller responded, "No, sir." The prosecutor then referred to this exchange on redirect, asking Miller, "Now, in this call when you brought up the murder, did he deny it?" Miller answered "No." Clarifying that Miller was talking about the events of September 28, 2010, the prosecutor asked, "Did he deny it when you brought it up? . . . Would he be, like, I don't know what you're talking about?" Miller answered "No" to both questions.

Contrary to appellant's argument, we see no support for the claim that Miller was allowed to express his opinion on the ultimate issue to be decided by the jury. This is simply not a natural reading of the exchange.

## C. The Trial Court Did Not Violate the Code of Judicial Conduct

Appellants argue that their convictions should be reversed, without any showing of prejudice, because the trial judge repeatedly told the prosecutors how to try their case. Although no such objection was made at trial, the government and appellants disagree as to whether we should review for plain error. We need not resolve this question because appellants have failed to show that the trial judge was biased in this case.

Importantly, appellants do not assert that the court displayed hostility toward them or their lawyers. *Cf. Kaliku v. United States*, 994 A.2d 765, 782 (D.C. 2010) (complaining of "the trial judge's alleged hostility toward and admonishment of Mr. Kaliku's trial counsel"); *In re J.A.*, 601 A.2d 69, 78 (D.C. 1991) (in a bench trial for alleged abuse and neglect of children, "the trial judge's conduct clearly demonstrated a significant level of bias reflecting personal distaste towards the mother"). Moreover, the comments of which they complain did not occur within the hearing of the jurors and thus could not have served as a basis for inferring that the trial judge favored the prosecution. Indeed, in many instances the court's remarks show frustration with the prosecutors.

Appellants principally rely on cases where trial judges created an appearance of impropriety, thus violating the Code of Judicial Conduct, because they engaged

in ex parte contacts or had a conflict of interest. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988) (conflict of interest); *Belton v. United States*, 581 A.2d 1205 (D.C. 1989) (ex parte conversations about defendant prior to sentencing); *Scott v. United States*, 559 A.2d 745 (D.C. 1990) (en banc) (conflict of interest). This is not such a case, nor is it like *In re J.A.*, *supra*, where we concluded that the judge presiding over a bench trial had demonstrated a significant level of bias. *See In re D.M.*, 993 A.2d 535, 540 (D.C. 2010) ("[T]here was neither an improper ex parte communication concerning appellant or his case nor any actual or apparent bias on the judge's part—and hence there was no violation of the canons of judicial ethics.").

There is no doubt that the court cautioned the prosecutors on many occasions that their direct examinations were taking too much time, often by going into too much detail or presenting too many exhibits. In the context of this very long trial, the trial judge was understandably, and properly, concerned that the parties not needlessly prolong the proceedings, and she had ample authority to require the attorneys to focus on key points. The Federal Rules of Evidence provide that "[t]he court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . avoid wasting time." Fed. R. Evid. 611(a)(2). *See Greenwood v. United States*, 659 A.2d 825, 828 (D.C. 1995) (endorsing the principles set forth in Rule 611(a)). Rule 403, to

which the court specifically referred, allows the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. *See (William) Johnson v. United States*, 683 A.2d 1087, 1099 (D.C. 1996) (en banc) (adopting Rule 403).

Sometimes the court suggested ways of streamlining the government's presentation. To emphasize its points, the court also cautioned the prosecutors that they were boring the jury. These comments were within the court's authority to manage the trial, and we are satisfied that the government gained no unfair advantage. It is not necessary to discuss each of the complaints made by appellants, but we have considered them all and hold that appellants have not carried their burden of showing that the trial judge was biased.

### D. The Supplemental Instruction on Aiding and Abetting

On March 20 (the eighth day of deliberations), the jury sent a note asking for clarification of the instructions regarding aiding and abetting and transferred intent. The aiding-and-abetting instruction—which the trial judge had stated applied only to the charges of murder, assault with intent to kill while armed ("AWIKWA"), and assault with a dangerous weapon ("ADW")—began: "You may find a defendant guilty of an offense without finding that he personally committed each

of the acts that make up the crime or that he was present while the crime was being committed." In the note, the jurors expressed "some confusion" because "there is no reference to these theories" in "[t]he way the counts are written"; "the language says we 'may' apply these theories, or should we consider this a mandatory requirement[?]" The trial court responded in part: "Even though they are not written into the elements of the offenses charged, you must consider all of the legal rules I have given you that apply to each offense. . . . You must consider the legal theory of aiding and abetting, as written, in deciding" the listed charges.[25]

All four appellants argue that this was an improper supplemental instruction regarding the principle of aiding and abetting.[26] (They do not dispute the supplemental instruction on transferred intent.) Johnson contends that the aiding-and-abetting instruction "favored the government" and "directed a guilty

---

[25] Counsel for Jackson, with whom the other three defendants concurred, unsuccessfully had asked the judge to replace "must" with "may" in every instance. The trial judge agreed to use the word "consider" rather than "apply." After the court mistakenly read the word "apply" in one portion of her oral instruction, she offered to tell the jury that "consider" was the accurate word; Jackson's counsel suggested that the court provide a correction solely in the written instruction, which the court did after all other counsel approved. Appellants do not argue that the alteration was error.

[26] Both Johnson and Jackson briefed this issue. Williams adopts Johnson's argument on this issue. The instructions on aiding and abetting referred to one count of murder and two counts of AWIKWA charging Givens, whose brief adopts the arguments of his co-appellants "to the extent they apply to his charges."

verdict" regarding the murder of Coates. Jackson asserts that the court "did not leave the jurors free to dismiss the aiding and abetting theory if it found the underlying facts insufficient." Reviewing the supplemental instruction for abuse of discretion, *see Yelverton v. United States*, 904 A.2d 383, 387 (D.C. 2006), we conclude that these claims lack merit.

Johnson claims that *Blaine v. United States*, 18 A.3d 766 (D.C. 2011), is a dispositive case in his favor, but *Blaine* does not support his argument. In that case, the jury asked for clarification of the reasonable doubt standard. *See id.* 769. In response, the trial judge repeated his earlier explanation based on the model instruction—which he had opined to counsel was "heavily weighted to the defense"—but added new language describing the government's burden of proof. *Id.* at 770-71. We held that this "unbalanced" instruction caused "a reasonable likelihood that the jury came to an understanding that impermissibly lowered the burden of proof." *Id.* at 779. By contrast, the trial judge here did not discuss again the definitions of the legal theories at issue. The instruction did not effectively direct a guilty verdict or favor the government. In context, the plain language of "must consider," instead of the defendants' preferred wording "may consider," properly clarified that the jury could not disregard the legal theories on which they had been instructed even though the theories were not described as elements of the offenses.

Nor did this instruction require the jury to find that Jackson was guilty of murder under the theory of aiding and abetting, as Jackson's brief asserts. To the contrary, the trial judge instructed: "Although it is mandatory that you consider these legal rules where I have told you to, it is up to you to decide what facts to find, and to decide whether the government has proved guilt of any charged offense beyond a reasonable doubt." When we read the supplemental instruction on aiding and abetting as a whole, as we must, *Buskey v. United States*, 148 A.3d 1193, 1205 (D.C. 2016); *(Gregory L.) Jackson v. United States*, 653 A.2d 843, 847 (D.C. 1995)), we conclude that the supplemental instruction was not erroneous.[27]

## IV.  Other Issues

### A. Sufficiency of the Evidence Against Jackson

Jackson argues that there was insufficient evidence to support his convictions for the criminal street gang offenses and the September 28, 2010, murder of Coates and wounding of Thompkins. In reviewing a sufficiency of the evidence challenge, we view the evidence in the light most favorable to the verdict, "recognizing the province of the trier of fact to weigh the evidence, determine the

---

[27] Appellant Jackson also asserts that a series of instructions given during deliberations coerced the jury into convicting him of the second-degree murder of Jamal Coates. Since the court is vacating that conviction on other grounds, we need not consider his jury coercion argument.

credibility of the witnesses and to draw reasonable inferences from the testimony."

*Dickerson v. United States*, 650 A.2d 680, 683 (D.C. 1994). We consider both

direct and circumstantial evidence in this analysis. *Id*. An appellant can prevail on

a sufficiency argument only if he establishes "that the government failed to provide

evidence from which a reasonable mind might fairly infer guilt beyond a

reasonable doubt." *Blair v. United States*, 114 A.3d 960, 976 (D.C. 2015) (internal

quotation marks omitted).

## 1. Jackson's Gang-Related Convictions

We begin with Jackson's argument (adopted by other appellants) that the

evidence was insufficient to establish his membership in a street gang. Defined by

statute, a criminal street gang is an association of six or more people that:

> (A) Has as a condition of membership or continued
> membership, the committing of or actively participating
> in committing a crime of violence, as defined by
> §23-1331(4)); or
>
> (B) Has as one of its purposes or frequent activities, the
> violation of the criminal laws of the District, or the
> United States, except for acts of civil disobedience.

D.C. Code § 22-951(e)(1). Jackson argues that the government failed to establish:

(1) his membership in an association with six or more individuals; and (2) that

such a group had as a condition of membership or as one of its purposes or frequent activities the violation of criminal laws. We disagree.[28]

Miller and Epps identified multiple members of G-Rod by name including, in addition to themselves and the four appellants, Lafonte Carlton, Devyn Black, and Marcus Wells. This testimony alone is enough to allow the jury to conclude that G-Rod was comprised of six or more individuals.

There was ample evidence to show that G-Rod had as a condition of membership, or that one of its frequent activities was, violating the criminal laws of the District. In order to maintain membership in G-Rod, all individuals were expected to participate in the "beef" between G-Rod and 1-7. In particular, Epps testified that he considered an individual to become a member of G-Rod when that person "start[ed] shooting guns and was willing to kill." Likewise Miller testified that members of G-Rod "[s]hared information, like, who we think [are] police or who's telling. We sell drugs. We commit robberies, murders, shootings." He explained that G-Rod members who engaged in "more fights[,] . . . more shootings[, and more] robberies" would enjoy greater respect and influence within the gang. There was additional testimony that G-Rod members coordinated to sell

---

[28] As explained below, however, we agree that Jackson could not be convicted of violating D.C. Code § 22-951(b) in connection with his conviction for misdemeanor conspiracy. *See infra* Section IV. C.

drugs within their territory and to exclude outside competitors, jointly possessed firearms, and banded together to participate in violent assaults on members of rival gangs, all of which are crimes within the District. And there was specific testimony that Jackson both sold "weight," *i.e.*, he was a supplier to other G-Rod members who sold drugs, and bought firearms with other G-Rod members. We conclude that there was sufficient evidence that Jackson was a member of a street gang. *See Tann v. United States*, 127 A.3d 400, 425-26 (D.C. 2015) (taking into consideration a group's defined territory, levels of loyalty, commission of crime, sharing of weapons, and willingness to "beef with rivals in the street" in determining that members were part of a criminal street gang).

## 2. Jackson's Second-Degree Murder Conviction

The government contended that Marcellus Jackson was guilty of the second-degree murder of Jamal Coates under an aiding and abetting theory. More specifically, the prosecutor argued in closing that Jackson was "the lookout for that murder"—the person who made the call to Keir Johnson and Lester Williams "to let them know which car the victims were in." Jackson argues that the government failed to present sufficient evidence: (1) that he had the requisite mens rea for the underlying death that the shooters caused, and (2) that he had a purposive attitude

toward the shooting that resulted in Coates's death. We agree with Jackson as to the second contention and thus need not decide the first.

When presented with a challenge to the sufficiency of the evidence supporting a criminal conviction, we review the evidence "in the light most favorable to the verdict," *Francis v. United States*, 256 A.3d 220, 233 (D.C. 2021), "giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Coleman v. United States*, 948 A.2d 534, 550 (D.C. 2008) (quoting *Freeman v. United States*, 912 A.2d 1213, 1218 (D.C. 2006)). We will reverse a conviction only if we determine that, based on the evidence presented by the government, no reasonable juror could have fairly concluded that the defendant was guilty of the crime charged beyond a reasonable doubt. *Id.*

Each element of a crime—the act, the attendant circumstances, and, in result crimes, the result—has a mens rea requirement all its own. At the outset, in order to find someone guilty of aiding and abetting second-degree murder while armed, the jury must find beyond a reasonable doubt that the accomplice *intended* to help the principal commit the act that caused the death. *Wilson-Bey v. United States*, 903 A.2d 818, 834 (D.C. 2006) (en banc). The "canonical formulation" of this requirement, *see Rosemond v. United States*, 572 U.S. 65, 76 (2014), comes from

Learned Hand's opinion in *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)—a formulation we reaffirmed in our en banc decision in *Wilson-Bey*, 903 A.2d at 831-35. *Peoni* states that conviction of a person for aiding and abetting a principal's crime requires that the alleged accomplice "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed"—in other words, he has a "purposive attitude toward it."[29] 100 F.2d at 402. This requirement of a purposive attitude toward the principal's act constituting the crime is needed "to establish liability as to one who did not himself engage in the conduct required for commission of the crime." *See* Wayne R. LaFave, Substantive Criminal Law, § 13.2(e), *Assistance or Encouragement to Reckless or Negligent Conduct* (3d ed. 2017 & 2020 supp.); *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 493, 504 (2023) (The accomplice's "conscious, voluntary, and culpable participation in another's wrongdoing" must be "both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor.").

_____

[29] As we noted in *Wilson-Bey*, "[t]he *Peoni* standard is widely regarded by legal scholars as logical and just," and its "purpose-based formulation" is "the prevailing authority defining accomplice liability." 903 A.3d at 836; *see also Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949); *Rosemond*, 572 U.S. at 71; *Tann v. United States*, 127 A.3d 400, 444-45 (D.C. 2015); *Walker v. United States*, 167 A.3d 1191, 1201 (D.C. 2017); *Little v. United States*, 989 A.2d 1096, 1102 (D.C. 2010).

Where additional attendant circumstances are also elements (for example, that a principal was armed during a robbery, that a statutory rape victim was underage, or that use of a vehicle was unauthorized), knowledge of such an element is typically sufficient to hold the accomplice responsible for that circumstance. *See, e.g.*, *Rosemond*, 572 U.S. at 77-81. But that is separate and apart from the requirement that the accomplice be shown to have a purposive attitude toward the act itself. *Id.* at 77 (holding that an accomplice in a robbery is also liable for *armed* robbery where he knew the principal was armed).

Lastly, when an accomplice is charged with a result crime—such as the homicide here, where a specific mens rea toward a resulting death is an element of the principal's offense—the government must satisfy another mens rea requirement for accomplices. *Bogdanov v. State*, 941 P.2d 247, 250-51 (Colo. 1997) (en banc) (referring to the "dual mental state requirement" for accomplice liability) (cited in *Tann v. United States*, 127 A.3d 400, 449 (D.C. 2015) (Glickman, J., dissenting)). In addition to proving beyond a reasonable doubt that the accomplice had a purposive attitude toward the principal's conduct that caused the death, *Wilson-Bey*, 903 A.2d at 836-38, the government must also present enough evidence to

prove that the accomplice had the statutorily required mens rea for the result.[30] *Id.*; *see also Perry v. United States*, 36 A.3d 799, 808 (D.C. 2011); *Kitt v. United States*, 904 A.2d 348, 356 & n.10 (D.C. 2006)).

So here, Jackson was convicted of aiding and abetting a result crime, second-degree murder, with an attendant circumstance that the shooter committed the offense while armed. That means the government had to present enough evidence to allow a reasonable juror to find beyond a reasonable doubt that: (1) Jackson had a purposive attitude toward the principals' conduct that caused the death (the shooting), (2) he knew the principals were armed, and (3) he acted at least with a "depraved heart"—meaning that he acted with the least demanding mens rea toward the resulting death that would support a conviction of second-degree murder. *See* note 30, *supra.* Rather than requiring proof of an intent to kill,

---

[30] In this case, where Mr. Jackson was charged with aiding and abetting the "kill[ing] of another" "with malice aforethought," D.C. Code § 22–2103, this means proving one of the three "distinct mental states" encompassed by "malice aforethought." *McKnight v. United States*, 102 A.3d 284, 287 (D.C. 2014) (citing *Comber v. United States*, 584 A.2d 26, 38-39 (D.C. 1990) (en banc)); *Comber*, 584 A.2d at 39 (explaining that the mens rea element of second-degree murder may be satisfied by the specific intent to kill, the specific intent to inflict serious bodily harm, or depraved heart murder). But depending on the charged offense, it might mean proving premeditation, as in a first-degree murder case like *Wilson-Bey*, or just proving negligence, *see, e.g., State v. McVay*, 132 A. 436, 439 (R.I. 1926) (affirming the involuntary manslaughter conviction of a transportation company manager on an aiding and abetting theory where that manager "intentionally direct[ed] and counsel[ed]" the captain and engineer of a steamer to run the ship's boiler too hard, a negligent act that caused several passengers' deaths).

this form of mens rea requires proof that the defendant acted with "gross recklessness" toward the resulting death, meaning "in conscious disregard of an extreme risk of death or serious bodily injury to the decedent," Transcript of 3/10/14 at 27; *see also Comber*, 584 A.2d at 52, under circumstances manifesting an "extreme indifference to human life."[31] *In re D.P.*, 122 A.3d 903 (D.C. 2015) (citing *Comber*, 584 A.2d at 38-39). The Model Penal Code's analog to depraved heart murder is "extremely reckless murder."[32]

---

[31] The game of Russian roulette illustrates how an accomplice can be convicted of an *unintentional* homicide like depraved-heart murder only if he *intentionally* aided the act causing the death. If a person is acting as a lookout during a game of Russian roulette—with a purposive attitude toward the game and acting with the intent to make it succeed—and one of the participants dies, that lookout could be guilty of depraved-heart murder as an accomplice because he intentionally aided the act causing death (the shooting during the game), and (surely) acted with the statutorily required mens rea, under circumstances manifesting a depraved indifference to human life. *See* D.C. Code § 22-2103; *Comber*, 584 A.2d at 38–39.

[32] "Extremely reckless murder" is committed "recklessly"—meaning with a conscious disregard of a substantial risk of death—and "under circumstances manifesting extreme indifference to the value of human life." Model Penal Code §§ 2.02, 210.2. This case was tried before this court endorsed the Model Penal Code's use of the "more particularized and standardized categorizations of mens rea" over the use of classifications such as "general" and "specific intent." *See Carrell v. United States*, 165 A.3d 314, 321 nn17 & 18, 324 (D.C. 2017) (en banc). The jury was therefore instructed with the definition of "depraved heart" malice set forth in *Comber*, 584 A.2d at 38-39. As the Model Penal Code language and the language from *Comber* make clear, the standards for depraved heart murder and extremely reckless murder are essentially the same.

Before applying these standards to our assessment of the sufficiency of the evidence of Jackson's mens rea, we take a moment to clarify certain aspects of accomplice liability doctrine that have generated confusion. First, it is not enough for the government to prove that Jackson knowingly facilitated the principal's act in this case. Citing various passages in various decisions of this court—both before and after our decision in *Wilson-Bey*—the government at times appears to suggest that an accomplice might be guilty as long as he is present and facilitates some conduct by the principal while knowing of the principal's intent. *See, e.g.*, Appellee's Br. at 218 (concluding that the government presented sufficient evidence "that Jackson, acting with malice, assisted in the murder of Coates and the assault on Thompkins"). And in fairness, some of our cases since *Wilson-Bey* have used language that could be interpreted to contradict *Peoni*. The government's brief describes our decision in *Downing v. United States*, 929 A.2d 848, 862 (D.C. 2007), for example, as standing for the proposition that "presence at the scene of a crime plus conduct which facilitates a crime supports an inference of guilt as an aider and abettor." Appellee's Br. at 220 (citing *Downing*, 929 A.2d at 862). Similarly, in *Lancaster v. United States*, 975 A.2d 168 (D.C. 2009), we said that the government must show that the accomplice "assisted or participated" in the crime with "guilty knowledge," while also stating that the accomplice must "share[] the same mens rea" as the principal. *Id.* at 174.

To the extent that any of this language is taken to mean that the accomplice need only commit some act, intentionally and with knowledge of the principal's intent to commit a crime and where that act ends up facilitating the principal's crime, it misconstrues the law. "Guilty knowledge"—sometimes characterized as the knowing facilitation of a principal's act while aware of his intent—has never been deemed sufficient by itself to show an accomplice had a purposive attitude toward elements (other than attendant circumstances), such as the principal's act or a particular result, like death in a homicide case. *See, e.g.*, *Wilson-Bey*, 903 A.2d at 834 n.28 (explaining the difference between the *Peoni* "purposive attitude" approach and a lesser standard that would impose accomplice liability on one whose conduct facilitates a crime "with knowledge of the principal's intent"); LaFave, Subst. Crim. L. § 13.2(e) (3d ed.) (describing the "*Peoni* rule [as] holding knowing facilitation insufficient").

The 1966 D.C. Circuit case *Cooper v. United States*, 357 F.2d 274 (D.C. Cir. 1966), is instructive on this point. In *Cooper*, a robbery victim was "violently knocked down" and "robbed while unconscious" by what he remembered as either one, two, or three people who were "together, seemingly." *Id.* at 275. The trial court instructed the jury that, as long as they found that Cooper was one of the three at the scene, they could find him guilty of aiding and abetting the robbery. The D.C. Circuit deemed this plain error, noting—as *Peoni* had held 30 years

before *Cooper* and as *Wilson-Bey* reaffirmed 40 years after *Cooper*—that "mere presence and guilty knowledge" of the principal's intent is insufficient for accomplice liability and that "purposive participation" is required. *Id.* at 276.

Second, some language in the government's brief appears to conflate the requirements for the different elements of aiding and abetting second-degree murder in a way that could obscure the need for independent proof that Jackson had a purposive attitude toward the shooting.

As a threshold matter, an important clarification of the mens rea for depraved-heart murder itself is in order. The government quotes language from *Comber* for the proposition that the mens rea for depraved-heart murder is a "wanton and willful disregard of an unreasonable human risk." *Comber* does use that language to characterize a depraved heart murder, *see* 584 A.2d at 38-39, but the description is not accurate without the language that follows it and elucidates the exacting view of depraved heart murder in use in the District of Columbia. Here, unlike in some jurisdictions at the time of *Comber*, "such depraved heart malice exists only where the perpetrator was subjectively aware that his or her conduct created an extreme risk of death or serious bodily injury, but engaged in that conduct nonetheless." *Id.* at 39; *see also McKnight v. United States*, 102 A.3d 284, 287 (D.C. 2014). Proof of gross or extreme recklessness is thus an integral

aspect of depraved-heart murder that amplifies the requirement of "wanton and willful disregard of an unreasonable human risk." The government's view of recklessness aligns more closely with the mental state for manslaughter. *See United States v. Dixon*, 419 F.2d 288, 292-93 (D.C. Cir. 1969) (Leventhal, J., concurring) (stating that "[t]he difference between that recklessness which displays depravity and such extreme and wanton disregard for human life as to constitute 'malice' and that recklessness that amounts only to manslaughter lies in the quality of the awareness of the risk") (cited in *Comber*, 584 A.2d at 39); *see also* Model Penal Code § 210.2 (extremely reckless murder); *id.* § 210.3 (reckless manslaughter).

Further, in stating that "the jury could have reasonably concluded that Jackson actively participated in a coordinated plan to identify 1-7 members" with at least "a wanton and willful disregard of an unreasonable human risk," the government mingles two separate mens rea requirements in a way that may inaccurately suggest that an accomplice need only participate in a way that ends up assisting the principal. "Actively participates" is phrasing the Supreme Court used to summarize *Peoni*'s formulation of the mens rea requirements for accomplice liability. *Rosemond*, 572 U.S. at 76-77. To "actively participate" therefore means to participate with the intent to make the principal succeed—again, with a purposive attitude toward the principal's actions. But this element is distinct from

the depraved-heart mens rea required by the statute. *Peoni*, 100 F.2d at 402. The Supreme Court's reference to "actively participates" thus does not mean that an accomplice can be guilty of second-degree murder because he was part of the scene or "up to no good" when a principal committed a violent act that was foreseeable.[33] While the government does have to show that Jackson acted with a depraved heart toward the resulting death, it must also show that Jackson acted with a purposive attitude toward the principal's conduct that caused the death—

---

[33] Some doctrines do allow criminal liability for the foreseeable violent acts of a principal where a defendant was actively participating in criminal activity with that person—for example, *Pinkerton* conspiracy, felony murder, and even accomplice liability in jurisdictions that follow the "natural and probable consequences" approach. *See Wilson-Bey*, 903 A.2d at 838. But the government did not charge Jackson on a *Pinkerton* or felony murder theory, and *Wilson-Bey* invalidated the "natural and probable consequences" instruction in aiding and abetting cases in the District of Columbia. Evidence that someone encouraged a friend armed with a gun to have a confrontation of some kind thus cannot be proof beyond a reasonable doubt that they intended to encourage their friend to shoot the victim. *See, e.g., State v. Bridges*, 628 A.2d 270, 281 (N.J. 1993) (upholding Bridges's murder conviction on *Pinkerton* liability grounds where he encouraged two friends to bring their guns for protection to help him fight someone at a party and where one of the friends ended up shooting someone in a way unintended by Bridges but foreseeable nonetheless); *id.* at 274 (describing *Pinkerton* liability as "broader than that of an accomplice, where the defendant must actually foresee and intend the result of his or her acts"—that is, intend to help the principal commit the act that caused the death and, in an intentional murder case, intend the death as well); *see also Twitter*, 598 U.S. at 489-90 (noting "the need to cabin aiding-and-abetting liability to cases of truly culpable conduct" because, among other things, aiding and abetting lacks the "significant limiting principle" of *Pinkerton* liability—the requirement of an "agreement with the primary wrongdoer to commit wrongful acts").

that is, the shooting.[34]   Again, each element of a crime has a separate mens rea requirement.

With this understanding of the distinct mens rea elements in play, we turn first to the sufficiency of the evidence that Jackson had a purposive attitude toward the shooting.   Jackson was convicted for having aided and abetted the fatal shooting of Jamal Coates and the assault of Phil Thompkins.   As detailed in the fact section at the beginning of this opinion, that shooting took place around 13th and U Streets NW when Thompkins, Coates, and Mico Thompson were sitting in Thompkins's car waiting to join a procession of vehicles after the funeral of Ashley McCrae.   Though the government's main focus was on proving Jackson's codefendants' guilt as the shooters, it did seek to establish Jackson's liability as an

---

[34]   The statutorily required mens rea for the result is "a necessary, but not a sufficient, condition for accomplice liability," *Tann v. United States*, 127 A.3d 400, 499 (D.C. 2015) (Glickman, J., concurring in part and dissenting in part), because the accomplice must also have a purposive attitude toward the principal's act that caused the death.   In this same vein, the dissent finds it significant that we have not taken issue with the trial court's mens rea instructions.   *See post* at 82.   We have not faulted the trial court's aiding-and-abetting instruction because the instruction contained the *Peoni* language requiring the jury to find that a person accused of aiding and abetting a crime "participated in the crime as something he wished to bring about" and "intended by his actions to make it succeed."   The instruction could be clearer on this point by explicitly telling jurors, in cases where a homicide is charged, that they must find that the accomplice had both a purposive attitude toward the principal's conduct that caused the death *and* the required mens rea for whatever level of homicide is charged.   Whether the standard instruction could be improved, however, is beyond our purview in this case.

accomplice to this murder, primarily based on evidence that he was on the lookout for rival gang members that day and that he called Johnson and Williams to tell them that a particular rival, Thompkins, was nearby and what kind of car he was driving. In this regard, the government's main proof was two funeral-goers' testimony that they saw Jackson and Williams outside the funeral that day and Brandon Miller's testimony about the car rides he gave Jackson, Johnson, and Williams and the call he received from Jackson shortly before the shooting. As to the first ride, Miller testified that shortly before noon on the day of the funeral, Jackson called him and asked him to pick him and Williams up at 15th and Harvard NW; Miller found the two men there with two bikes and heard Williams say—and Jackson agree—that there was "no point in us sitting down there no longer." Relatedly, one witness testified that she saw Jackson outside the church where the funeral was being held, "just sitting on the phone," and another said she saw Williams on a bike, "just circling around in the same little corner" and seeming to be "looking for someone."

Not long after Miller dropped Jackson and Williams at a park nearby and went home, Jackson called Miller again and instructed him to pick up him and Williams, and from there to pick up Johnson. According to Miller, Williams and Johnson sat in the back seat of the car and Jackson, in front, told Miller to "head down to the church." Miller testified that Johnson was carrying something in a

"plastic shoe bag" and was talking on the phone, at one point asking if the person he was talking to could "see his cousin down there and where they was at." Miller said that he did not know who Johnson was talking about at the time but that "cousin" was sometimes used to refer to Thompkins because Johnson and Thompkins looked alike.

Miller dropped Jackson off around 12th and V, and Jackson walked toward the church after telling Miller to be prepared to answer his phone. Miller, Johnson, and Williams then drove around the area, and at some point when Miller was driving north on 13th Street approaching U Street, Jackson called him and told him to tell Johnson that "they're in a car like Yusef." Miller testified that at that point Johnson pointed to the gold-colored car Thompkins was driving that was about to pass by Miller's car in the opposite direction but that instead "buck[ed] a U in front of us." Johnson then "asked [Miller] if [he] could whip," which to Miller meant that Johnson "was ready to shoot out the car." Miller told him "no, not right here." As they drove past Thompkins's car around 13th and U, Miller saw Jackson standing on the corner and Thompkins "looking in [Jackson's] direction." Miller then pulled into and parked in an alley, and within a matter of seconds, Williams and Johnson got out of the car and ran toward 13th Street, Miller heard gunshots, and Williams and Johnson returned to the car. Miller testified that sometime later, after he fled the area with Johnson and Williams and after he and Johnson tried to

dispose of the guns, he saw Jackson walking into 1401 Fairmont, where both Miller and Johnson lived, and heading in the direction of Johnson's apartment.

On this record, we agree with the government that a reasonable juror could find beyond a reasonable doubt that Jackson called Miller and conveyed to Johnson and Williams the message that Thompkins was in "a car like Yusef."[35] We also assume the evidence could support a finding that Jackson at least presumed that Johnson and Williams were armed. But the government did not present sufficient evidence—without relying on conjecture—to prove beyond a reasonable doubt that Jackson knew Johnson and Williams's intent to physically harm or kill Thompkins and that Jackson called Miller for the purpose of helping those men shoot the occupants of Thompkins's car. *See Curry v. United States*, 520 A.2d 255, 263 (D.C. 1987) (stating that "the evidence is insufficient if, in order to convict, the jury is required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation.").

---

[35] Jackson argued that the phone records did not support the government's contention that Jackson called Miller's phone around the time the funeral was letting out. Notwithstanding that gap in the evidence, the jury was permitted to credit Miller's testimony that Jackson called him. *Gibson v. United States*, 792 A.2d 1059, 1066 (D.C. 2002) (stating that "inconsistencies in the evidence affect only its weight, not its sufficiency, and are in any event for the jury to resolve").

At trial, no one testified that on the day of the shooting, Jackson or anyone in Jackson's presence said anything about a plan to shoot Thompkins or anyone else. Miller did not suggest that Jackson knew that Johnson and Williams planned to shoot Thompkins, and Miller himself testified that he did not know until Johnson asked him if he could "whip"[36]—he initially thought that there would "maybe [be] a fight, but I wasn't too positive." There was no evidence that Jackson actively helped the other men evade detection afterward. Even assuming that Jackson had a less than benign reason for alerting Williams and Johnson to Thompkins's location, it is equally plausible on this record that Jackson thought they were going to do something besides shoot the car's occupants—to threaten or warn them, for example, or shoot out the tires of their car—and his purpose was to help them do that.[37] "An intent to advance some different or lesser offense is not, or at least not

---

[36] Miller testified that he did not see any gun in his car, did not know Johnson and Williams were armed, and did not see a gun at all until Williams returned to the car after the shooting holding one.

[37] The dissent calls these alternative inferences "a considerable stretch," but it does not explain how evidence of gang tensions and guns is so much more indicative of Jackson's intent to help Johnson and Williams shoot the victims, especially given the evidence that most fights do not end up in a person being shot. *See infra* at 72-74. In fact, in requesting an instruction on assault with a deadly weapon as a lesser of assault with intent to kill, the prosecutor argued that the jury could find that Johnson and Williams "had only the intent to commit an assault" or "to frighten [the 1-7 members]." The prosecutor also asked the court to instruct on the lesser offense of second-degree murder because the jury could conclude that the shooting was not premeditated and that Johnson and Williams committed the

usually, sufficient: Instead, the intent must go to the specific and entire crime charged."[38] *Rosemond*, 572 U.S. at 76.

The government argues that it is not required to negate every theory of innocence. But the possibility that Jackson may have intended to help Johnson and Williams deliver a threat to Thompkins rather than shoot the occupants of his car is not merely a hypothesis of innocence; it is an equally if not more plausible inference that necessarily creates reasonable doubt as to whether Jackson intended to aid such a shooting. *See Peery v. United States*, 849 A.2d 999, 1001-02 (D.C. 2004) (noting that a reasonable factfinder "must have had a reasonable doubt" where Peery's actions were "insolubly ambiguous" and where a person in Peery's shoes who was not guilty of the charged offense "might have acted exactly as he did") (quoting *Rivas v. United States*, 783 A.2d 125, 137 (D.C. 2001) (en banc)). "Where evidence of guilt is in equipoise with evidence of innocence, it is perforce

---

shooting when they became "so incensed" and "too angry just upon seeing the 1-7 members." The trial court granted each of these requests.

[38] Thus any suggestion that a reasonable juror could conclude beyond a reasonable doubt that Jackson had a purposive attitude toward the shooting he was accused of aiding and abetting as long as the jury could "reasonably infer" that Jackson did *something* runs afoul of *Peoni* and its progeny. Such a view also disregards our repeated statements that sufficient evidence is not merely *some* evidence but evidence that could "reasonably be inferred with the requisite certainty to support a finding of guilt *beyond a reasonable doubt*." *McKnight*, 102 A.3d at 289 (emphasis added).

insufficient for conviction by the constitutional standard, beyond a reasonable doubt." *Harris v. United States*, 125 A.3d 704, 709 (D.C. 2015) (citing *Rivas*, 783 A.2d at 133–34).

The government points to the evidence of G-Rod's violent history, its ongoing beef with the members of 1-7, and Jackson's certain awareness of the ubiquity of guns among G-Rod members as demonstrating his intent to take part in the shooting. But not every confrontation among armed gang members ends in a shooting. In this case, the record suggests that very few of them do. Perhaps anyone who helps initiate a confrontation between neighborhood rivals ought to know they will be armed. That knowledge does not make every facilitator of such a confrontation culpable of shooting someone under an aiding and abetting theory. Even accepting that Jackson knew Johnson and Williams were always armed, that would also have been true in other non-chance encounters with rivals where no guns were fired—encounters that must have been the norm given the evidence that Johnson had shot at a member of the rival gang on only one occasion. Indeed, the government's allegation of conspiracy—which charges that G-Rod members conspired to rob, threaten, and assault people as well as shoot them—itself stands as an acknowledgement that, as the prosecutor argued in closing, "G-Rod does all of these things." The government presented evidence, for example, that G-Rod

members and their rivals sometimes exchanged words without inflicting bodily harm.[39] They engaged in physical fights and brawls without any shots fired.[40]

This is not to play down the evidence that some of G-Rod members' confrontations with rivals involve shootings. There is evidence they do. It is just to say that Jackson's awareness of G-Rod's ongoing beef with 1-7 in general, Johnson's beef with Thompkins in particular, and Johnson and Williams's penchant for carrying guns cannot, without more, support an inference *beyond a reasonable doubt* that when Jackson alerted these men to Thompkins's

---

[39] Mico Thompson testified, for example, that there would be "verbal slurring," "verbal confrontations," "verbal arguments," "verbal disagreements, verbal threats, stuff like that" between the people he grew up with around 17th and Euclid and the people from the 14th and Girard neighborhood when they crossed paths—including a "verbal altercation" Thompson himself had with Lester Williams. Thompson said that although he knew about fights that happened among these rivals, he personally had never shot at or had a physical fight with anyone from 14th and Girard, and the shooting that resulted in Jamal Coates's death was the first time he was involved in anything more than a verbal altercation with someone from 14th and Girard. Thompson testified that he had once been shot at in his car by an unknown person, but said it "could have been anybody" and did not attribute it to a particular rival or dispute.

[40] In closing, the prosecutor highlighted one such fight, eight or nine years before trial, in which G-Rod members, including Johnson and Williams, had jumped Phil Thompkins, "kicking and hitting" him, two weeks after Johnson had argued with Thompkins at a Christmas party. The prosecutor also called the jury's attention to testimony about one G-Rod member (Lafonte Carlton) "fak[ing] like he was going to shoot" a rival from another neighborhood. The number and variety of these encounters undermines the reasonableness of inferring from such instances, beyond a reasonable doubt, that Jackson was purposefully assisting the *shooting* of a person.

approaching car, he intended to help them shoot Thompkins and wanted them to succeed. "Proof beyond a reasonable doubt is not merely a guideline for the trier of fact; it also furnishes a standard for judicial review of the sufficiency of the evidence." *Rivas*, 783 A.2d at 184.

A number of our cases shed light on what kind of evidence is sufficient to prove an accomplice's purposive attitude and what is too speculative. *Wilson-Bey* itself provides two examples of evidence sufficient to support the murder convictions of sisters Lakeisha Wilson-Bey and Sckeena Marbury for their respective roles in killing Tomika Blackwell after Blackwell got the best of Marbury in a fight. 903 A.2d at 844-48. The government named Wilson-Bey as the principal who fatally stabbed Blackwell and Marbury as an aider and abettor who participated in the assault. The government argued, and the jury was instructed, that either woman could be convicted as an aider and abettor. As to Marbury, the government presented testimony that she had "openly stated her intention to kill 'that bitch.'"[41] And the evidence against Wilson-Bey included one

---

[41] Even with this evidence that Ms. Marbury said she was going to "kill that bitch," the court held that "an impartial juror might readily have a reasonable doubt whether Ms. Marbury in fact formed an intent to kill Ms. Blackwell, as distinguished from an intent to join with others in beating up Ms. Blackwell and her friends." *Id.* at 845. For this reason, the trial court's error in instructing the jury that "[a]n aider and abett[o]r is legally responsible for the acts of other persons

witness's testimony that upon seeing her sister's injuries, Wilson-Bey "went into the kitchen, grabbed a knife," and said, "I am going to kill that bitch." *Id.* at 845. The en banc court found that the evidence was sufficient to prove that each woman—Marbury as an aider and abettor and Wilson-Bey as either the principal or an aider and abettor—had premeditated, deliberated, and intended to kill Blackwell. *Id.*

The evidence we deemed sufficient to support Marbury's and Wilson-Bey's convictions for aiding and abetting first-degree murder included clear-cut indications of those women's purposive attitude toward the fatal stabbing. The same was true in *Downing,* a case the government relies on. Though Downing did not personally kill the victim, he was the first among several assailants to suggest doing so, he provided directions to the location where the murder took place, he helped remove the victim from the car, and he was standing next to the man who fatally shot the victim. 929 A.2d at 863-64; *see also Coleman v. United States*, 948 A.2d 534, 550-51 (D.C. 2008) (finding sufficient evidence that Jones, the alleged accomplice, intended the principals to shoot two men who had tried to break into Jones's car where Jones had just handed a machine gun to one of the principals and when one of the principals asked him, "[W]hat you going to do about this here?"

that are the natural and probable consequences of the crime or criminal venture in which she intentionally participates" was not harmless. *Id.* at 826, 844-45.

Jones responded, "fuck 'em'"—a statement the court said a jury could reasonably understand to be "a direct order to shoot the young men"). Similarly, in *Howard v. United States*, 656 A.2d 1106 (D.C. 1995), we held that there was sufficient proof that Ronald Willis, the accomplice, had the requisite intent to kill the victims where Willis, after observing a verbal confrontation between Howard and one of the victims, helped Howard dig up a pistol and a sawed-off shotgun buried in Howard's back yard, accompanied him to the location of the shooting while carrying the pistol, handed that pistol to Howard after watching Howard first shoot at the victims with the shotgun, and left the scene with Howard after Howard fired additional shots with the pistol. *Id.* at 1109-10. And in *Lancaster v. United States*, 975 A.2d 168, 174 (D.C. 2009), another case the government cites, the record contained evidence that Chanita Gayles lured a man to her apartment with the promise of sex for money, briefly left saying she had to see a neighbor, then returned followed by three men who robbed the man. This court held that this evidence, combined with evidence that Gayles watched the robbery and that one of the robbers spoke to her in a way that suggested acquaintance, was sufficient to allow a reasonable juror to find "that Gayles knew the robbers and shared their intent to rob" the victim. *Id.* at 174.

The record here lacks the kind of explicit indications of the accomplice's knowledge of and purposive attitude toward the stabbing, shooting, or robbery at

issue in these cases, or even the sort of less explicit but still significant evidence—like Jones's "fuck 'em" comment in *Coleman*—that nevertheless substantiates the accomplice's intentional involvement in the criminal act.[42]  Our record is more akin to that in *McKnight*, 102 A.3d at 289.[43]  There, the evidence showed that the principal, Curtis McKnight, was in an argument with Raynard Jennings when Jennings began rummaging through the trunk of his car apparently looking for something.  At this point, Robert Pumphrey—charged as an aider and abettor in Jennings's murder—said "he's looking for something, he's looking for something," retrieved a gun from his own car, and handed it to McKnight, who then fatally shot Jennings as he was running away.  *Id.* at 286.  We reversed Pumphrey's second-degree murder conviction because his intent could not "reasonably be inferred with the requisite certainty to support a finding of guilt beyond a reasonable doubt" where the theory the government argued to the jury

---

[42] As explained above, knowing facilitation of a criminal act is not sufficient to establish accomplice liability.  In the circumstances of this case, however, proof that Jackson knew Johnson and Williams intended to commit a shooting would be significant circumstantial evidence that when Jackson alerted them to the proximity of Thompkins's car, he had a purposive attitude and wanted the shooters to succeed.

[43] Contrary to the dissent's view, our consideration of the lack of "explicit indications" of an accomplice's purposive attitude does not evince our misunderstanding of the standard for reviewing challenges to the sufficiency of the evidence or suggest that such indications are in all circumstances required.  Instead, it helps to situate this case on the continuum of cases grappling with similar claims.

rested on speculation. The court distinguished *Coleman* and *Howard*, where the circumstances immediately preceding the shooting—among other things, Jones handing Coleman a gun and saying "fuck 'em" and Howard shooting at the victim twice with one gun before Willis handed him a different gun—provided the context needed to support an inference of the accomplice's intent to kill. In those cases, unlike in *McKnight*, the court said, "whether or how the shooter would use the gun was no longer in question." *Id.* at 290.

That is not true in the present case. Just as in *McKnight*, where the jury could only speculate as to Pumphrey's intent when handing McKnight the gun, the jury here could only speculate as to the accuracy of the government's theory that Jackson made the phone call to Miller knowing Johnson and Williams intended to shoot Thompkins and intending to help them succeed. "It is the rare case where the defendant will clearly articulate his intent before he acts, and intent must often be inferred." *Id.* at 287-88 (citing *Jones v. United States*, 716 A.2d 160, 166 (D.C. 1998)). But as discussed above, neither the direct nor circumstantial evidence of Jackson's intent supports an inference, beyond a reasonable doubt, that Jackson envisioned and purposefully facilitated a shooting.

The 1966 *Cooper* case from the D.C. Circuit is again instructive. 357 F.2d 274. In that case—where the court found plain error in an instruction allowing the

jury to convict the alleged accomplice of robbery if it found he was one of the three men present at the scene—one of the two judges voting for reversal, Judge Edgerton, would have reversed not only for the instructional error but because the evidence against Cooper was legally insufficient. 357 F.2d at 276. Judge Bazelon wrote separately, finding plain error[44] but deeming the evidence sufficient "by a hair's breadth" because the government had presented evidence that Cooper "triggered" the robbery with a signal to a co-participant (who was also Cooper's friend) and afterwards hurried the participants along to avoid detection, telling a relative they "had to go." *Id.* at 277 (Bazelon, J., concurring). In this sense, the barely sufficient evidence in *Cooper* is similar to the record in *Lancaster*, where the evidence strongly suggested that Chanita Gayles had given such a "signal" to trigger the robbery. Here, in contrast, a reasonable juror could infer that Jackson provided information to shooters who had a particular intent, but without more corroborative evidence that Jackson himself had the individual intent to take part in a shooting or at least had knowledge of Johnson and Williams's intent to shoot the occupants of Thompkins's car, *see supra* note 42, there are insufficient grounds for

---

[44] *Id.* at 278-79 (Bazelon, J., concurring). Judge Bazelon relied on *United States v. Garguilo*, 310 F.2d 249, 254-55 (2d Cir. 1962), which likewise held that a jury instruction suggesting that "mere presence and guilty knowledge" of the principal's intent were sufficient amounted to plain error.

concluding beyond a reasonable doubt that Jackson's call, along with the other circumstantial evidence, showed his purposive attitude toward the shooting.

In sum, the government offered no evidence, beyond the absorbing if speculative storyline it set forth in closing argument, that Mr. Jackson knew of, much less intentionally aided, the principal's act that caused Jamal Coates's death—shooting bullets into the car Thompkins was driving. Relying on the same storyline, our colleague opens his dissent with a quote from the trial court's vivid retelling of the prosecutor's narrative at Jackson's sentencing—a narrative that is irrelevant to our de novo review of the sufficiency of the evidence. The dissent describes the trial court's summary as "accurate," but in fact, the account—including the trial court's statement that Jackson "persuaded" the shooters to arm themselves and to commit the shooting—is unsubstantiated in the record. The trial court's use of incriminating verbs does not change the fact that no reasonable juror could find beyond a reasonable doubt, without speculating, that Jackson "recruited" the shooters, "persuaded" them to commit murder, and "chose" to watch the shooting from a distance because he "knew" how to keep himself hidden. *See post* at 81. Because we conclude that the government did not present legally sufficient evidence to show Jackson had a purposive attitude toward the conduct that caused the death—the shooting—we need not reach the separate questions whether the evidence was sufficient to show that Jackson had the

requisite depraved-heart mental state toward the resulting death or actual knowledge that the shooters were armed.

The constitutional insufficiency of the evidence supporting Jackson's conviction of second-degree murder while armed means that his conviction for gang membership stemming from the murder of Jamal Coates, *see* D.C. Code § 22-951(e)(1), is likewise based on insufficient evidence.[45] We reach a different result as to the ADW conviction pertaining to the wounding of Thompkins, however. As to that count, the court instructed the jury that the government "must prove a threatening act," but it "need not prove that the defendant intended to injure the complainant" to prove assault with a dangerous weapon, which involved "[v]oluntarily pointing a dangerous weapon at another person in a threatening manner or voluntarily using it in a way that would reasonably create in the other person a fear of immediate injury." Transcript of 3/10/14 at 32–33. At least some jurors may have reasonably inferred beyond a reasonable doubt that Jackson

---

[45] As the trial court noted in its instructions to the jury, conviction of being a member of a criminal street gang depends upon conviction of the offense to which that particular charge relates: "If you find a defendant not guilty of the crime to which a criminal street gang charge relates, you must find the defendant not guilty of the related criminal street gang charge also."

intended to assist Johnson and Williams in scaring or threatening Mr. Thompkins, but not killing him.[46]

We vacate Jackson's conviction of second-degree murder while armed and the gang-membership conviction stemming from that offense, and we instruct the Superior Court to enter a judgment of acquittal on those counts. We affirm Jackson's conviction of ADW.

## B. Givens's Post-Arrest Statements

Appellant Givens also asserts that the police continued to interrogate him after he invoked his right to remain silent, thus violating *Miranda v. Arizona*, 384 U.S. 436 (1966). The government argues to the contrary that it permissibly asked "booking questions." *See Pennsylvania v. Muniz*, 496 U.S. 582 (1990). During

---

[46] There are strong indications in the record that the jury actually convicted Jackson of aiding and abetting an unintentional killing under a "depraved heart" theory—including the jury's acquittal of Jackson of aiding and abetting an assault with intent to kill as to the same conduct (shooting into a car with people in it) that resulted in Jamal Coates's death. The jury also acquitted Mr. Jackson of first-degree murder in this shooting. It may be that the evidence suggests at most that Jackson was negligent or reckless toward someone dying because of his actions in helping his friends locate Thompkins. He may be guilty of reckless endangerment or some other crime that requires only some action that ends up putting someone in danger. But Jackson did not himself cause anyone's death, which is why the government relied on an accomplice theory of liability, and why it was required to present proof beyond a reasonable doubt that he intended to help the shooting that caused the death.

questioning, Givens denied that he was known by the nickname "Chop" and he provided a false or inaccurate cell phone number. The government asserted at trial that these statements showed consciousness of guilt.

We need not decide whether the police "scrupulously honored" appellant's "right to cut off questioning." *See Michigan v. Mosley*, 423 U.S. 96, 104 (1975). The statements had limited inculpatory value, and there was powerful evidence of Givens's guilt. Tyon Britton told three different individuals that "Chop" was one of the shooters, and he selected Givens's picture from a photo array just two days after the shooting. Givens had a distinctive appearance, and several witnesses, including Givens's grandmother and his basketball coach, testified that his nickname was "Chop." Moreover, Givens confessed to Ricardo Epps, who provided valuable background information about Givens's interest in shooting members of 1-7. Any error in admitting these statements was harmless beyond a reasonable doubt. *See Lewis v. United States*, 483 A.2d 1125, 1130 (D.C. 1984) (endorsing use of the *Chapman* harmless error standard for *Miranda* violations).

## C. Conspiracy-Related Criminal Street Gang Convictions and Merger

Each appellant was convicted of multiple counts of violating D.C. Code § 22-951(b)(1) for actively participating in a criminal street gang and knowingly or willfully participating in a felony or violent misdemeanor "committed for the

benefit of, at the direction of, or in association with any other member or participant of that criminal street gang." Jackson challenges the sufficiency of the evidence for each of these criminal street gang ("CSG") convictions. All appellants argue that a number of their convictions for CSG and possession of a firearm during a crime of violence ("PFCV") must merge. Lastly, each appellant argues that we should vacate the CSG conviction tied to his misdemeanor conspiracy conviction because misdemeanor conspiracy is not a qualifying conviction under the CSG statute. We address each of these contentions in turn.

As discussed above, the evidence was sufficient to allow a reasonable juror to conclude both that Jackson was a member of a criminal street gang and that he committed a felony offense (ADW) in association with other members of the criminal street gang. *See* Section IV.A.1, *supra*. It follows that there was sufficient evidence to convict Jackson of the CSG offense related to the ADW of Thompkins.

As to the question of merger, each appellant was convicted of multiple CSG offenses related to single incidents. For example, appellant Johnson was convicted of five CSG counts related to his shooting of Kevin Parker on June 27 and seven such offenses related to the shootings on September 28. We (and the government) agree with appellants' argument that they may remain convicted of only one CSG

offense for a "single violent act," as our decisions have defined that term. *See (Joseph) Jenkins v. United States*, 113 A.3d 535, 553 (D.C. 2015). Therefore, only one CSG conviction associated with a felony conviction may survive with respect to Jackson, predicated on the events of September 28; only one with respect to Williams, predicated on the events of September 28; only two with respect to Johnson—one predicated on the events of June 27; and one based on the events of September 28; and only one with respect to Givens, predicated on the events of August 11. Based on similar reasoning, the various convictions of the appellants for PFCV related to a single violent act merge under the principles endorsed in *Matthews v. United States*, 892 A.2d 1100, 1105 (D.C. 2006), and *Nixon v. United States*, 730 A.2d 145, 153 (D.C. 1999). Once appellate review in this court is complete, the trial court should merge the convictions accordingly and resentence as necessary.

Finally, each appellant's CSG conviction predicated on his conspiracy conviction must be vacated. The jurors were given a list of overt acts upon which to base their decision about guilt or innocence for conspiracy and instructed that, in order to find any defendant guilty, they must unanimously find that a conspirator committed at least one of the overt acts. But the jury was not told to specify on the verdict form which predicate act provided the basis for its collective determination of guilt. Accordingly, the court proposed that the underlying offense should be

deemed a misdemeanor for all defendants. Before imposing the applicable maximum sentence for a misdemeanor—180 days—the trial court confirmed that there was no objection to the proposed course of action.

The trial court then commented that the CSG convictions predicated on the conspiracy conviction might need to be dismissed, but the government disagreed. Noting that no defendant had raised the issue, the court proceeded to sentencing on those counts and suggested that the parties could litigate the question on appeal. In its brief to this court the government does not argue that the trial court erred in entering the conspiracy convictions as misdemeanors; therefore, the only question is whether a CSG conviction under D.C. Code § 22-951(b)(1) may be based on a misdemeanor conspiracy conviction. We hold that it cannot.

We review this question of statutory interpretation de novo. *McNeely v. United States*, 874 A.2d 371, 387 (D.C. 2005). When interpreting a statute, we begin with its plain language; and, where that language is unambiguous and does not produce an absurd result, we conclude our analysis. *Id.* In the case of D.C. Code § 22-951, the language is clear. The commission of "any felony" offense and a select group of "violent misdemeanors" may form the basis for a violation of D.C. Code § 22-951(b)(1). The statute enumerates the seven qualifying "violent misdemeanor" offenses, D.C. Code § 22-951(e)(2)(A)–(G), and the plain language

of the statute indicates that this list is exhaustive. *See* D.C. Code § 22-951(e)(2) (providing that "'[v]iolent misdemeanor' shall mean: . . . "); *see also Bolz v. District of Columbia*, 149 A.3d 1130, 1140 (D.C. 2016) (Where a statute includes an enumerated list, "it may be presumed to be exhaustive unless otherwise provided.") (internal quotation marks omitted); *cf. Aboye v. United States*, 121 A.3d 1245, 1248–49 (D.C. 2015) (determining that the list of enumerated crimes subject to enhanced punishment under the Bias-Related Crime Act was illustrative, rather than exhaustive, based on the statute's use of the word "including" before the enumeration). Misdemeanor conspiracy does not appear on the list of qualifying "violent misdemeanors." D.C. Code § 22-951(b)(2). Therefore, each appellant's CSG conviction based on his misdemeanor conspiracy conviction must be vacated, and the court should resentence as necessary.

## V.   Conclusion

We vacate the CSG/conspiracy conviction of each appellant and order the merger of certain convictions as detailed above. We otherwise affirm the convictions of appellant Givens and sever his appeal from the appeals of Williams, Jackson, and Johnson. As explained above, we reverse appellant Jackson's conviction for second-degree murder while armed and the related CSG conviction. We provisionally affirm the remaining convictions of appellants Williams,

Jackson, and Johnson, but remand the case with instructions for the trial court to conduct an evidentiary hearing pursuant to *Motorola* and Rule 702 regarding the admissibility of the cell-site testimony. Notwithstanding our remand of the case, the time for each appellant to seek rehearing or rehearing en banc of this decision commences with the issuance of today's judgments. D.C. App. R. 40(a) and 35(c). If appellants Williams, Jackson, and Johnson are aggrieved by the trial court's ruling on remand, they may file new notices of appeal.

*It is so ordered*.

FISHER, *Senior Judge*, dissenting in part: Before imposing sentence on appellant Jackson, Judge Leibovitz commented that he had "played a major role . . . in the murder of Jamal Coates." That morning he "recruited all the players. He identified the funeral of a human being as a good place to commit murder. He persuaded his codefendants to drive with him, arm themselves, get out of the car and commit [the shootings] that he chose to observe from a distance, because he knew how to keep himself hidden while other people committed offenses and took the blame for them." This is a pithy, but accurate, summary of what happened. I cannot agree that the evidence was insufficient to convict appellant Jackson of second-degree murder while armed.

To obtain a conviction on an aiding and abetting theory, the government must prove that a defendant "associate[d] himself with the venture, . . . participate[d] in it as in something that he wishe[d] to bring about, [and] s[ought] by his action to make it succeed," *Wilson-Bey v. United States*, 903 A.2d 818, 831 (D.C. 2006) (en banc) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (acknowledging the implication of a "purposive attitude" in these actions)), and that the defendant had the state of mind required as an element of the crime. *Id*. at 830-39; *see also Kitt v. United States*, 904 A.2d 348, 356 (D.C. 2006) ("where a specific *mens rea* is an element of a criminal offense, a defendant must have had that *mens rea* himself to be guilty of that offense, whether he is charged as the principal actor or as an aider and abettor"). Further, in order to prove that a defendant is guilty as an aider and abettor of committing a crime while armed, the government must prove that the defendant knew in advance that a confederate would be armed while committing the offense—in other words, that the defendant intended to aid an *armed* offense. *See Rosemond v. United States*, 572 U.S. 65, 78 (2014).

My colleagues spend a lot of time criticizing the government's brief, but they do not fault the trial court's instructions. The jurors knew that they had to focus on Jackson's state of mind as well as on his words and actions. Using language from *Peoni*, the court instructed that the jurors must assess appellant

Jackson's purpose—whether he "knowingly associated himself with the commission of the crime, . . . participated in the crime as something he wished to bring about[,] and . . . intended by his actions to make it succeed." When it explained the mens rea element of second-degree murder, the court correctly instructed that the government was required to prove that "the defendant intended to kill or seriously injure the decedent or he acted in conscious disregard of an extreme risk of death or serious bodily injury to the decedent." Moreover, the court said, "regardless of whether a defendant is an aider or abettor or principal offender, the government must prove beyond a reasonable doubt that the defendant intended to kill or seriously injure the decedent or acted in conscious disregard of an extreme risk of death or serious bodily injury to the decedent."

"As a general rule, the requisite *mens rea* may be inferable from the facts and circumstances surrounding a murder." *Kitt*, 904 A.2d at 353. Thus, an aider and abettor's "purposive attitude" may be inferred from the surrounding circumstances. Based on the evidence summarized above, a reasonable juror could have concluded that the government had met its burden. When he provided leadership, key information, and logistical support to Johnson and Williams, Jackson manifested a purposive attitude toward the shooting that followed and he

either intended to kill or seriously injure someone in Thompkins's car or he acted with "a depraved heart." *See Comber*, 584 A.2d at 38-39.[1]

"It is not necessary that the government's evidence compel a finding of guilt beyond a reasonable doubt, nor that the government negate every possible inference of innocence." *Timberlake v. United States*, 758 A.2d 978, 980 (D.C. 2000). The majority recites this standard but misapplies it, lamenting, for example, the lack of "the kind of explicit indications of the accomplice's . . . purposive attitude" found in some other cases. *Ante* at 69. The court also notes that some encounters between members of the rival gangs did not involve gunfire. But there was testimony that tensions between the two crews had escalated to the point where there was "no more [unarmed] fighting . . . it was all shooting." The jury is entitled to weigh the evidence and to draw justifiable inferences from it. *Gibson v. United States*, 792 A.2d 1059, 1065 (D.C. 2002). "When two or more inferences can reasonably be deduced from the facts, the reviewing court is without power to substitute its deductions for those of the [fact-finders]." *Cunningham v. District of*

---

[1] Appellant Jackson and the majority misplace their reliance on *McKnight v. United States*, 102 A.3d 284 (D.C. 2014). In contrast to this case, the government in *McKnight* gave the jury only a snapshot of the defendant's actions just before a shooting, and "presented no backstory . . . that might have explained [the] shooting as an act of purposeful retribution." *Id*. at 289.

*Columbia*, 235 A.3d 749, 757 (D.C. 2020) (quoting *Kruse v. District of Columbia*, 171 A.2d 752, 753 (D.C. 1961)).[2]

Moreover, the test for sufficiency does not require that the members of this court be convinced beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. Here, the jury's decision clearly was rational.

As appellate judges, we must not usurp the role of the jury by surmising, for example, that Jackson may have intended only to help his comrades locate Thompkins so that they could deliver a warning or shoot out the tires on his car. *Ante* at 63. And it is a considerable stretch to say that these inferences are just as plausible as the government's theory. *Id*. "Jurors need not check their common sense at the courthouse doors, but are permitted to use the saving grace of common sense and their everyday experience to draw reasonable inferences from the evidence presented." *Covington v. United States*, 278 A.3d 90, 99 (D.C. 2022)

---

[2] Contrary to the suggestion in the majority opinion, *see* note 37, *supra*, a prosecutor's request that the court instruct on a lesser-included offense does not indicate that the evidence is *insufficient* to convict on the greater offense. Rather, such a request recognizes that it is the jury's job to weigh the evidence and that the jury might not be *persuaded* to convict on the greater charge.

(internal quotation marks omitted). Given the history between 1-7 and G-Rod, and the manhunt that occurred near the church, there was sufficient evidence to conclude that Jackson, Johnson, and Williams intended to track down Thompkins, a member of 1-7, and shoot him. In the process, they shot Coates as well. We cannot fairly say that this was a case where the jury "cross[ed] the bounds of permissible inference and enter[ed] the forbidden territory of conjecture and speculation." *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (internal quotation marks omitted).[3]

---

[3] Because the evidence was sufficient to support Jackson's conviction for second-degree murder while armed, I also disagree with the majority's decision to vacate the gang count stemming from this conviction.